# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE SEARS HOMETOWN AND OUTLET STORES, INC. STOCKHOLDER LITIGATION | ) ) ) | CONSOLIDATED C.A. No. 2019-0798-JTL |

## POST-TRIAL OPINION

Date Submitted: November 4, 2023
Date Decided: January 24, 2024

Ned Weinberger, Mark Richardson, Michael C. Wagner, Jiahui (Rose) Wang, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; Peter B. Andrews, Craig J. Springer, David M. Sborz, Christopher P. Quinn, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Samuel L. Closic, Seth T. Ford, Robert B. Lackey, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; David Schwartz, John Vielandi, LABATON KELLER SUCHAROW LLP, New York, New York; Carl L. Stine, Adam J. Blander, WOLF POPPER LLP, New York, New York; *Counsel for Co-Lead Plaintiffs*; Donald J. Enright, Elizabeth K. Tripodi, LEVI & KORSINSKY, LLP, Washington, District of Columbia; *Executive Committee for Co-Lead Plaintiffs*.

Michael A. Pittenger, Matthew E. Fischer, Jacqueline A. Rogers, Lucille E. Wiesner, Nicholas D. Mozal, Charles P. Wood, Abraham C. Schneider, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Defendants Edward S. Lampert, ESL Investments, Inc., ESL Partners, LP, RBS Partners, LP, Transform Holdco LLC, and Hometown Midco LLC.*

**LASTER, V.C.**

"[T]he most interesting conflicts in corporation law are engendered not by 'bad guys' seeking with guile to protect or advance private interests. The difficult and interesting questions arise from differing, but plausible, conceptions of what constitutes right action in the circumstances."[1] Chancellor Allen's observation still holds, and by that standard, this is a fascinating case.

A controlled public company operated through two separate business segments. One was a bad business that steadily lost money. The other was a good business that had just achieved its first profitable year after four years of losses. A committee of independent directors endorsed a plan to liquidate the bad business and continue operating the good business. They valued the combined plan at up to $9.58 per share. That valuation depended on successfully liquidating the inventory from the bad business over the course of eight weeks. It also depended on the good business meeting lofty expectations going forward.

The company's controlling stockholder believed that the liquidation plan would destroy value. He thought the liquidation could not generate the expected level of proceeds and would trigger additional third-party liabilities. He worried that the good business lacked scale and a track record.

The controller tried to convince the committee not to implement the liquidation plan. The committee persisted and set a hard deadline for moving forward. Perceiving

---

[1] Chancellor William T. Allen, *Ambiguity in Corporation Law*, 22 Del. J. Corp. L. 894, 899 (1997).

no alternative, the controller used his voting power as a stockholder to adopt a bylaw amendment that prevented the board from implementing the liquidation plan without two separate approvals, thirty business days apart. Those procedural requirements did not technically foreclose the liquidation plan, but they ensured that the controller had a window to act again if the board pursued it. The controller candidly acknowledged at trial that he had no intention of letting the liquidation plan become reality.

The controller also removed the two committee members who he believed were the most insistent on the liquidation plan. He filled the vacancies with individuals whom he did not know personally, but who were affiliated with one of his financial backers. The new appointees became directors, but did not serve on the committee.

The plaintiffs are minority stockholders who contend that the controller breached his fiduciary duties by using his stockholder voting power to block the liquidation plan. Delaware law does not clearly state what standard of review (if any) applies to a controller's exercise of stockholder voting power. Some authorities suggest a controller owes no fiduciary duties when voting. Other authorities apply a fiduciary framework without spelling out the details.

This decision holds that when exercising stockholder-level voting power, a controller owes a duty of good faith that demands the controller not harm the corporation or its minority stockholders intentionally. The controller also owes a duty of care that demands the controller not harm the corporation or its minority stockholders through grossly negligent action. Directors, by contrast, must act

2

affirmatively to promote the best interests of the corporation, and they must subjectively believe that the actions they take serve that end. A controller need not meet that higher standard when exercising stockholder-level voting rights.

Delaware decisions have not identified a standard of review that would apply when a court reviews a controller's actions for compliance with a standard of conduct. A court applies enhanced scrutiny when directors face subtle conflicts and situational pressures that could undermine the integrity of their decisions, and when they take action that invades space traditionally reserved for the stockholders.

Here, the shoe is on the other foot. In response to a perceived threat, the controller took action that invaded the space typically reserved for the board of directors. The controller faced a subtle conflict, because while the actions he took affected all stockholders equally, he had business agreements with the corporation that could have skewed his judgment. That is a controller-oriented version of a situation where enhanced scrutiny should apply.

Enhanced scrutiny is an ends-means test. The fiduciaries bear the burden of proving that they sought to achieve a proper end and had a good faith basis for acting. But showing a valid end is not enough. The fiduciaries also must show that they adopted a reasonable means of achieving that end.

The plaintiffs contend that the controller exercised his voting power self-interestedly to cut off the value-maximizing option and channel the corporation into an alternative that benefitted himself. That is one plausible view of the evidence. But after hearing the controller testify firsthand, evaluating his credibility, and weighing

3

his testimony in the context of the evidentiary record as a whole, I find by a preponderance of the evidence that the controller did not intend to harm the corporation and its stockholders. He believed in good faith—and I find correctly—that the liquidation plan could not achieve the committee's lofty expectations because the committee's advisors and management had failed to consider the extent of the third-party liabilities that the liquidation plan could trigger. Nor did the controller act in a grossly negligent manner. Although he did not prepare detailed analyses, he engaged in discussions with the committee, understood their plan, and had sufficient information—including about the perils of retail store liquidations—to make an assessment that was not grossly negligent. He also had the most to lose as a stockholder. When the controller exercised his stockholder-level voting power, he acted consistently with his fiduciary duties.

If the story ended there and the company had continued in the status quo that existed before the controller intervened, then judgment would be entered in favor of the defendants. But the sole remaining special committee member did not think the status quo was viable. Something had to change.

The sole remaining committee member decided that a deal with the controller was the only realistic option. He negotiated with the controller, and they agreed on an end-stage transaction that eliminated the minority stockholders' interests in the company.

4

The controller bore the burden of proving that the end-stage transaction was entirely fair. Entire fairness is a unitary standard, but it typically involves analyzing a procedural dimension (fair dealing) and an economic dimension (fair price).

The transaction agreement called for the controller to pay base consideration of $2.25 per share. It also gave the company the right to shop the good business to third parties. If the company obtained a price above a negotiated floor, then the minority stockholders participated pro rata in the additional consideration. That process generated a market-tested price for the good business. Although the parties submitted discounted cash flow valuations for the good business, there is no reason to engage in that valuation exercise when a market-tested price exists.

The challenge lies in valuing the company without the good business. The main components are (i) the net proceeds from a liquidation of the bad business's inventory, (ii) the additional third-party liabilities that the liquidation could trigger, (iii) the company's net debt, and (iv) the value of the company's net operating losses. The experts largely agree on the last two components. Management provided an estimate of the second component, but the defendants argued convincingly that the estimate was too low. The defendants seemed to think the figure was off by multiples. This decision doubles management's estimate, resulting in a rough justice figure that favors the plaintiffs.

That leaves the first component. The contemporaneous documents contain a series of estimates for the proceeds that a liquidation of the bad business's inventory could generate. This decision makes a factual finding based on that evidence.

5

Taken as a whole, that evidence indicates that the controller paid a price for the bad business's inventory that was below the range of fairness. That means the same is true for the transaction as a whole.

The fair dealing dimension also falls short. The lone remaining committee member tried to negotiate, and there is evidence of arm's length bargaining over the go-shop mechanism. But the two sides failed to bargain over the value of the bad business, and the special committee was unable to extract a fair price for the company as a whole. The Controller Intervention had tilted the playing field, and the fallout from that game-changing action was too great.

When a conflict transaction is not entirely fair, a self-dealing fiduciary is liable without regard to the fiduciary's mental state. Here, the controller seems to have believed sincerely that the transaction was fair. He nonetheless must face liability. That is the risk that a fiduciary takes in a self-dealing transaction.

This decision awards damages equal to the difference between what the minority stockholders received and the fair value of the company. That figure amounts to $1.78 per share. The minority owns 10,267,611 shares, bringing the aggregate award to $18,314,800.24, plus pre- and post-judgment interest.

## I.     FACTUAL BACKGROUND

The facts are drawn from the post-trial record. Having evaluated the credibility of witnesses and weighed the evidence, the court makes the following findings.[2]

---

[2] The parties agreed to 139 stipulations of fact, cited as PTO ¶ —. Two fact witnesses and three expert witnesses testified during a three-day trial. The parties

6

## A.    The Company's Origins

The company is Sears Hometown and Outlet Stores, Inc. ("SHOS" or the "Company"). As its name implies, it has a long-time association with Sears, Roebuck and Co. ("Sears").

Founded in 1893, Sears has a storied 125-year history. Sears' eponymous founder, Richard Warren Sears, was a railway station agent who saw a business opportunity in the number of pioneers settling the West. He started selling watches by mail, then partnered with Alvah Curtis Roebuck and later Julius Rosenwald to create an innovative mail-order catalog. Sears opened its first brick-and-mortar store in 1925, then expanded rapidly to become a staple of American shopping malls.

In the late twentieth century, Sears struggled against the rising tide of e-commerce. In 2005, Edward "Eddie" S. Lampert orchestrated a merger that combined Sears and Kmart Corporation under the ownership of a new entity, Sears Holdings Corporation ("Holdings"). Lampert became Chairman of the Holdings' board of directors. He took over as CEO of Holdings in 2013.

Lampert cut his teeth at Goldman Sachs, where he started in 1984. He worked in the Risk Arbitrage Department, investing in takeovers, bankruptcies, and "anything related to a corporate reorganization." Lampert Tr. 9. After four years at

---

introduced 1,210 exhibits, including deposition transcripts from seventeen individuals. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" reference trial exhibits. If more convenient, references to trial exhibits use internal paragraphs or sections.

Goldman, Lampert started an investment management firm called ESL Investments, Inc. He remains the Chairman and CEO of ESL.[3]

The Company started as a subsidiary of Holdings. In October 2012, Holdings spun off the Company as a separate, publicly traded entity. As the holders of a majority of Holdings' common stock, the ESL Funds received a majority of the Company's common stock.

Through the ESL Funds, Lampert controlled the Company. But before the events giving rise to this case, he had been a hands-off controller and largely passive investor. He did not sit on the Company's board of directors (the "Board"), and there were no ESL personnel or Holdings' officers on the Board. The only meaningful relationship Lampert had with any Company director was with Josephine Linden, a longtime friend and former Goldman Sachs colleague, who was also an investor in one of the ESL Funds. Lampert spent relatively little time focusing on the Company. He had never acted by written consent to amend the bylaws or replace any director—

---

[3] Symptomatic of the invariable complexity of investment fund structures, ESL controls a tangle of affiliated funds and entities. The entities pertinent to this decision include (i) ESL Partners, L.P., (ii) JPP II, LLC, (iii) SPE I Partners, LP, (iv) SPE Master I, LP, (v) RBS Partners, L.P., and (vi) JPP, LLC. *See* JX 178 at 16. For simplicity, this decision refers to those entities as the "ESL Funds." Lampert is the human principal who controls the ESL Funds. Although the differences among entities and their status as separate jural persons are significant for many purposes, they are not for this case. For purposes of the equitable analysis of fiduciary duties, a court looks to substance, not form. Lampert controlled ESL, which controlled the ESL Funds. There is no meaningful distinction for purposes of the equitable claims addressed here.

whether at SHOS or any other public company. Lampert limited his involvement to periodic check-ins with the senior management after quarterly earnings releases.

The Company conducted business through two segments: (i) the Sears Hometown and Hardware Segment ("Hometown") and (ii) the Sears Outlet Segment ("Outlet"). Hometown was the larger of the two, representing approximately two-thirds of the Company's assets and generating a similar portion of its revenue.

Hometown stores sold home appliances, lawn and garden equipment, tools, sporting goods, and household goods, including products under the major Sears brands of Kenmore, Craftsman, and Diehard. Hometown stores were much smaller than typical Sears department stores and were predominantly located in rural markets. Independent dealers operated nearly all the stores under agreements with a Company subsidiary (the "Dealer Agreements").

The Dealer Agreements ran for three to five years, were terminable only on default, and required individual arbitration of any disputes. Hometown was obligated to provide inventory on consignment and pay commissions on sales. The dealers secured and managed the locations and employees.

Outlet stores sold the same types of products as Hometown but using a different business model. Outlet's inventory primarily consisted of scratched-and-dented, refurbished, or discontinued appliances sold at discounted prices. While Hometown relied heavily on Sears for inventory, Outlet sourced over 80% of its products from other manufacturers. Outlet also had a repair network capable of fixing

9

every product it sold. Outlet's business strategy was unique, and it had no nationwide competitors.

The Company relied heavily on Holdings for infrastructure, products, and services. In connection with the spinoff, the Company entered into agreements with Holdings covering inventory procurement, intellectual property, logistics, Sears-branded credit cards, and various types of management services (collectively, the "Related-Party Agreements").

The Related-Party Agreements were generally favorable to the Company. For example, under the inventory procurement agreement, Holdings provided inventory at cost, enabling the Company to benefit from Sears' purchasing power. The volume of payments exchanged under the inventory procurement agreement was high, but it was not a profit center for Holdings. The other services agreements enabled the Company to receive services from Holdings on terms that the Company could not otherwise obtain.

## B.    The Segments Diverge.

After the spinoff, the Company's performance deteriorated. Both segments fared poorly.

Hometown generated losses that increased every year from 2014 to 2018. By 2018, Hometown was no longer profitable. Over this period, the Company closed unprofitable stores and liquidated their inventory. Those liquidations took place over a period of years and never involved more than twenty to thirty stores at once. But the tranches added up, and in 2018, the Company closed 125 stores.

10

The Company's liquidations also focused on stores that were approaching the expiration of their Dealer Agreements or performing poorly, which facilitated agreed-upon terminations. By late 2018, the Company had 549 Hometown stores, less than half its original 1,117. The following table provides more specific information:

| Hometown | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Number of Stores | 1,117 | 1,109 | 1,001 | 871 | 768 | 549 |
| Operating Income | $19, 498 | ($178,906) | ($15,648) | ($35,341) | ($45,109) | ($58,331) |
| Revenue Growth | N/A | (6.6%) | (3.7%) | (11.7%) | (18.2%) | (18.6%) |
| EBITDA | N/A | ($8,202) | ($10,080) | ($24,704) | ($37,150) | ($51,061) |

Outlet initially followed a similar downward trajectory. After generating approximately $45 million of EBITDA in 2013, its EBITDA plummeted to negative $17.5 million in 2015, then reached negative $33 million in 2017. In 2018, however, Outlet generated positive EBITDA of $25 million—its first profitable result in four years. The Company attributed the improvement to a new pricing strategy and new supply agreements. Management cautioned that the changes could be temporary if the higher prices hurt sales or if the comparatively short-term supply agreements were renegotiated. The following table provides more specific information:

| Outlet | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Number of Stores | 143 | 151 | 159 | 149 | 132 | 128 |
| Operating Income | $41, 577 | $7,747 | ($26,524) | ($12,314) | ($42,311) | $19,340 |
| Revenue Growth | N/A | 8.8% | (0.9%) | (4.1%) | (13.9%) | (9.5%) |
| EBITDA | $45,695 | $14,102 | ($17,546) | ($25,340) | ($33,874) | $25,175 |

The Company's stock price tracked its performance. After reaching a high of $50 per share shortly after the spinoff, the stock price sank to below $2 per share for extended periods during 2017, 2018, and 2019.

## C.    The Special Committee

In 2016, the ESL Funds purchased more shares of Company common stock. At the time, Lampert was exploring strategic alternatives for the Sears flagship brands, and the Board thought that Lampert might want the Company to be part of a transaction. The Board formed a special committee and empowered it with the exclusive authority to address any potential transaction that Lampert might propose (the "Special Committee").

The original members of the Special Committee were Kevin Longino and David Robbins. Both were relatively new to the Board in 2016. Longino had spent most of his career working at Compaq Computer Corp. After leaving Compaq, he advised various startups before becoming CEO of the National Kidney Foundation. Robbins had spent twenty years in Big Law, then founded and managed a series of private

12

equity funds. He was intensely focused on stockholder value. Neither had any ties to Lampert or the ESL Funds. Both were disinterested and independent.

Shearman & Sterling LLP served as the Company's legal advisor. Shearman also began advising the Special Committee. Rory O'Halloran was the lead attorney from Shearman. O'Halloran testified live at trial and was a highly credible witness.

The Special Committee hired Peter J. Solomon Securities Company, LLC ("Solomon") as its financial advisor. Derek Pitts led the Solomon team.

In January 2017, Solomon provided an overview of the Company and its value. The football field showed that the Company's 52-week stock price of $4.55 to $8.65 far exceeded its valuation based on other methodologies.

- A comparable companies valuation yielded $0.25 to $1.25 per share.

- A comparable transactions valuation yielded $2.00 to $3.00 per share.

- A discounted cash flow valuation yielded $1.00 to $2.95 per share.

- A liquidation analysis yielded $0.30 to $3.75 per share.

JX 42 at 15. The liquidation analysis projected that the Company could realize 60% to 80% of the value of its inventory. *Id.* at 22.

Although the Special Committee and its advisors were ready to engage with Lampert, no one called. Rather than spinning its wheels, the Special Committee went into hibernation.

### D. Inquiries In Connection With A Small Stores Strategy

In September 2018, the possibility of a transaction resurfaced during a regular quarterly phone call between Lampert and William Powell, the Company's CEO. Powell had joined Holdings in 2003 and served in a variety of roles, eventually

becoming Vice President and General Manager of Outlet. Powell was a member of the team that executed the spinoff, and he became the Company's Chief Operating Officer after that transaction. He became president and CEO in 2015.

Lampert and Powell typically spoke around the time of the Company's quarterly earnings release. During their calls, Powell gave Lampert his perspective on the business, and they discussed what was working and not working.

In September 2018, the Company announced disappointing numbers. During their call, Lampert described a small-store strategy that he was considering for Holdings. He and Powell discussed how Hometown's stores might fit into that strategy and whether there was a possibility for some type of transaction. On October 10, Lampert asked Powell for financial information about Hometown's dealer-run stores. Lampert followed up later that day with additional questions.

On October 11, 2018, the motivation for Lampert's inquiries became clear when Holdings' shares dropped 15% on news that its lenders were pushing for a liquidation. Lampert had not been seeking information because he wanted to do a deal with the Company, but rather because as part of a liquidation, he might purchase a subset of Sears' stores and run them himself using a small-store strategy. He wanted information to evaluate that opportunity. Later that day, Powell sent Lampert the cost estimates, then he and Lampert had a follow-up call.

The potential liquidation of Holdings had serious implications for the Company. Hometown depended on Holdings for 75% of its inventory, which Holdings obtained under one of the Related-Party Agreements. To finance its operations,

14

Hometown relied on an asset-based lending facility and term loan. The Company's lenders could easily view a Holdings' liquidation as a threat to their collateral. If Holdings filed for bankruptcy, then the lenders might claim that the Company had suffered a material adverse effect. And if Holdings rejected the Related-Party Agreements as part of a bankruptcy, the lenders could declare a default.

In an email to E.J. Bird, the Company's Chief Financial Officer, and Charles Hansen, the Company's General Counsel, Powell described the situation bluntly: "This is f–ing scary." JX 113 at 1. Management developed various financing alternatives, but none seemed realistic.

If Holdings liquidated, then management saw few options. One was to sell either Hometown or the whole Company to Lampert or a third party. Another was to shut down many of the Hometown stores and attempt to make the remnant profitable. A third was to liquidate Hometown, then operate Outlet.

Powell thought that the answer was obvious. He told the other senior officers that they needed "to liquidate all or a large position of the Hometown business." JX 113 at 1.

## E.    Holdings Files For Bankruptcy.

On October 15, 2018, Holdings filed a voluntary petition to reorganize under Chapter 11 of the bankruptcy code. Holdings announced that after reorganizing, it planned to pursue a small-store strategy.

As part of the bankruptcy, Lampert stepped down as CEO of Holdings. He remained Chairman of the Holdings board. Lampert became engrossed in the Holdings' bankruptcy, which required 95% of this time and 100% of his focus. He felt

15

"a great sense of urgency" to save Holdings from liquidating, which some of its creditors wanted. Lampert Tr. 26.

The Board met on October 17, 2018, to discuss the implications of the Holdings bankruptcy. Management described the potential effects and explained that if there was any material impact on the Company's performance or liquidity, then "continuing to operate the Hometown Segment would quickly become untenable." JX 119 at 18. Put differently, Hometown would have to liquidate.

Management presented two liquidation options. One involved liquidating all of Hometown's six hundred and thirty-seven stores. The other contemplated liquidating all of the dealer-operated stores while keeping fifty-six Company-owned stores.

Management tried to estimate the value of the liquidation options. Management assumed that the Company could sell the Hometown inventory for 95% of its book value, which was equal to its cost. Management based that estimate on its experience liquidating smaller tranches of stores over the previous four years. Those liquidations typically involved twenty to thirty stores at a time. They also involved Dealer Agreements that were expiring or terminated consensually. The dealers cooperated to liquidate the inventory, and the Company could support the effort because it was continuing as a going concern.

Now, management was contemplating a rapid liquidation involving all inventory from all stores in conjunction with Hometown going out of business. That would breach the Dealer Agreements and expose the Company to dealer claims. Dealers also could engage in self-help by seizing inventory and selling it themselves.

16

Despite those differences, management assumed that it could generate the same level of proceeds from the inventory sales and that liquidation-related liabilities would be comparable. The defendants proved at trial that those assumptions were too optimistic.

After the presentation, Powell summarized two phone calls he and Bird had with Lampert. During the calls, Lampert had "speculated" about "possible future business opportunities" between Holdings, the Company, and ESL. *See* JX 118 at 2.

The directors met in executive session to discuss the Company's alternatives. *See* JX 118 at 2. They resolved to "[g]et rid of [the] hometown dreck" and to "keep Outlet—[the] real business." JX 117 at 1. They also discussed a possible transaction with Holdings. They reached a consensus that the Special Committee needed to take the lead on any transaction with Lampert. *Id.*

During a meeting on October 22, 2018, the Board reactivated the Special Committee and expanded its authority to include any bankruptcy-related transaction. The Board added William K. Phelan, the Chairman of the Board, as a third member of the Special Committee. Phelan had worked at Sears from 1992 to 2011. He held a series of positions in the finance function, including serving as Senior Vice President of Finance from 2005 to 2011 and briefly as Acting Chief Financial Officer during 2011. He knew Holdings' financial statements inside and out.[4]

---

[4] As a former employee of Holdings, Phelan received a monthly pension of $1,886. The Board determined that the amount was immaterial. *See* JX 131. Through

17

## F.    Early Discussions With Lampert

In late October 2018, Lampert and Powell discussed the possibility of a management buyout during one of their periodic calls.[5] The discussions were purely conceptual and did not involve any specifics. Afterwards, Lampert's counsel at Cleary Gottlieb Steen & Hamilton LLP ("Cleary") contacted the Company's general counsel and Shearman to relate that Lampert "would be looking for [Powell] to help develop a proposal to present to ESL, and for which ESL would be expected to provide financing." JX 139 at 5.

Powell properly sought authorization from the Special Committee before proceeding further. The Special Committee instructed him not to devote resources to a management buyout unless Lampert demonstrated serious interest in pursuing it. Shearman informed Cleary of the Special Committee's decision and relayed that the Special Committee, not management, would be the point of contact for any discussions. No proposal was ever provided.

---

his conduct, Phelan demonstrated beyond any doubt that he was independent of Lampert, the ESL Funds, and Holdings.

[5] The parties disputed whether Lampert initiated the discussions about a management buyout. O'Halloran recalled Lampert floating the idea. *See* O'Halloran 22–23. Lampert recalled Powell socializing it as one option among many. At trial, Lampert emphasized that he had his hands full with the Holdings bankruptcy but wanted to be responsive to Powell. Lampert Tr. 190–93. The evidence as a whole suggests that Lampert initiated the discussions. *See* JX 139; JX 979; JX 1188. The issue is immaterial to the outcome of the case.

18

**G.    Hometown Declines Further.**

The Holdings bankruptcy sent Hometown's business into a tailspin. Hometown had difficulty obtaining inventory from Holdings, and the value of the Sears brand deteriorated. From October 15, 2018 (when Holdings filed for bankruptcy) to January 5, 2019, Hometown's comparable store sales fell by 19.6%. By January, 109 of Hometown's 514 stores were unprofitable.

In a quarterly earnings report filed on November 3, 2018, management disclosed that the Company's outside auditor had "substantial doubt" about its ability to continue as a going concern. *See* JX 156 at 12. After seeing the going concern qualification, the Company's lead lender—Bank of America N.A.—asked the Company to work with AlixPartners, LLP, a financial advisory and consulting firm known for its work in the turnaround space. Bank of America hired Tiger Valuation Services, LLC ("Tiger") to opine on the net orderly liquidation value of the Company's inventory.

The silver lining was Outlet. Over the same period, Outlet's comparable store sales *increased* marginally by 0.3%. By January 2019, only eight of Outlet's 126 stores were unprofitable. Management believed that Outlet's stronger performance resulted from its weaker associations with Holdings and the Sears brand.

On December 7, 2018, the Company's former President and Chief Executive Officer, Bruce Johnson, contacted Powell about buying Outlet. Powell responded, "I can assure you the Outlet cash printing machine is a big part of [our] plans, so it is currently very unavailable for sale!" JX 158 at 1.

**H.    The Board Revisits The Company's Alternatives.**

During a meeting on December 12, 2018, the Board considered the implications of the Holdings bankruptcy and the Company's alternatives if Holdings liquidated. Management identified four possibilities:

- A transaction in which either ESL or a third-party buyer of the major Sears brands acquired the whole Company or Hometown.

- A liquidation of Hometown, after which the Company would continue to operate the Outlet business.

- A Company bankruptcy.

- A transaction in which a third party acquired the major Sears brands, then agreed to do business with Hometown on the same or better terms as Holdings.

JX 161 at 18–19.

Management viewed the first option as the "best from a stockholder perspective" because the "Hometown business is significantly more valuable than current economics if merged with key [Holdings] assets." *Id.* at 20. Management did not provide any meaningful analysis of the third or fourth options.

Management spent the most time analyzing the second option: liquidating Hometown and operating Outlet as a small public company. The value of that option depended in the first instance on the net proceeds from a Hometown liquidation.

To calculate net proceeds, management estimated the percentage of book value that the Company could realize when selling inventory. Again relying on its experience with small-scale liquidations, management projected that Hometown could liquidate its inventory over eight weeks for 95% of cost. *Id.* at 23.

20

Another key input was any third-party liabilities associated with the liquidation. Management did not project any significant liabilities. *Id.* at 23–24. That was striking, because the Dealer Agreements did not give Hometown a unilateral termination right. *Id.* at 33. At trial, the Special Committee's counsel acknowledged that a Hometown liquidation could have led to more than 400 individual arbitrations in which dealers sought damages consisting of lease liabilities, operating costs, and lost profits. The Committee's counsel acknowledged that he did not assess those liabilities. O'Halloran Tr. 385–91.

Instead, counsel advised management, and management advised the Special Committee, that it was "more likely than not" that the Company "would not incur a significant loss" from the Hometown liquidation. JX 161 at 31. Counsel and management reasoned that the Holdings bankruptcy made it impossible or, at a minimum, commercially impracticable for the Company to perform under the Dealer Agreements, which provided a defense to any claim for breach. Counsel and management also thought that even if the claim survived, the dealers could not prove damages because "but for the segment liquidation [the Company] likely would have experienced its own complete liquidation from which the dealers likely would receive little or nothing." *Id.*

Management was equally optimistic about Outlet's ability to operate on its own. *Id.* at 26–27. The presentation devoted twenty slides to the numerous tasks that management would have to complete to stand up Outlet as an independent public company. *See id.* at 37–57. Based on those optimistic assumptions, management

projected that the Company could liquidate Hometown, use the proceeds to pay off the Company's debt, and still have $8.9 million of cash on hand. *Id.* at 24.

At management's request, AlixPartners began analyzing the liquidation plan. Within days, AlixPartners identified third-party liabilities as a key risk, noting: "Most cancellations of dealer agreements so far have been mutually agreed upon. With hundreds of stores having to be liquidated in the [H]ometown segment, [the Company] could be exposed to litigation/claims from many of these dealers if a[] [Holdings] liquidation is not a 'force majeure' cause for the closings." JX 1138 at 2. AlixPartners also reviewed the Company's business plans and its thirteen-week cash flow forecasts, helped management develop revised projections, and advised management on obtaining covenant relief from its lenders.[6]

Management separately consulted with Richards, Layton & Finger, P.A. to determine whether the Company could implement the Hometown-liquidation plan unilaterally, without a stockholder vote. Management was concerned that selling Hometown or its inventory could require stockholder approval as a sale of substantially all of the Company's assets, which would give Lampert the ability to block that option if he disagreed with it.

---

[6] The defendants argue that AlixPartners' mandate did not include independently analyzing the Hometown liquidation. Dkt. 230 at 16. But AlixPartners was hired to review the Company's options, and those scenarios included the status quo, going out of business, or either selling or liquidating Hometown. *See* JX 176. The defendants also contend that AlixPartners did not have the experience to review the liquidation analysis. It did, which was why Bank of America wanted the Company to hire AlixPartners.

22

## I.    Transform Buys Holdings' Assets.

In late January 2019, a newly formed ESL entity named Transform Holdco LLC ("Transform") bid successfully to acquire substantially all of Holdings' assets. That transaction destroyed the premise of the Outlet-only plan, which assumed Holdings would liquidate in bankruptcy, forcing Hometown to liquidate. The sale to Transform closed in early February.

Management, however, had grown to like the idea of liquidating Hometown and running Outlet as an independent public company. They continued working on a plan under which the Company would either liquidate or sell Hometown, use the proceeds to pay down debt, then operate Outlet as a standalone business.

During a Board meeting at the end of January 2019, management argued that the Hometown-liquidation plan remained the best option regardless of what happened to Holdings. The Company's outside counsel provided a reasoned opinion concluding that while the answer was not free from doubt, it was more likely than not that a sale of Hometown or its inventory would not require a stockholder vote.

During a meeting of the Board on February 20, 2019, Powell presented a revised operating and capital plan for the Company. It included financial projections for fiscal years 2019, 2020, and 2021 that assumed (i) Transform's acquisition of Holdings' assets would not have any material impact on the Company, (ii) the Company could continue sourcing Sears products from Transform, (iii) the Company would have adequate liquidity, and (iv) the Company could extend its loans. The plan anticipated that Hometown would continue to close stores, leaving approximately 300 by the end of 2019. The Board unanimously supported the plan.

## J.    Hometown's Business Deteriorates.

Instead of stabilizing, Hometown's business declined further, and management grew concerned that the Company's lenders would restrict its credit. At 4 a.m. on March 1, 2019, Powell asked Phelan to call an emergency Board meeting.

One issue was uncertainty over whether Transform would extend the Related-Party Agreements. When management approached Lampert, he was attempting to refinance the debt Transform had taken on to acquire Holdings' assets. Seeking to bolster Transform's balance sheet, Lampert conditioned the renewal on the Company depositing $10–12 million in an "inventory pool." JX 223 at 10. The deposit would violate the Company's debt agreements, and management refused. *Id.*; JX 225.

Thinking it might spur Lampert to reconsider his demand, AlixPartners told management to discuss the Hometown-liquidation plan with Lampert. The Company did not need the Related-Party Agreements to pursue the Hometown-liquidation plan, because the plan contemplated liquidating Hometown and operating Outlet as a standalone entity. AlixPartners believed that if Lampert understood that the Company had a viable alternative, then he would agree to a renewal.

During a Board meeting on March 7, 2019, management identified three paths. The first was to sell Hometown or the Company as a whole to Lampert or a third party. The second was to make significant changes to the Hometown business by modifying the Dealer Agreements to increase profitability, recognizing that most dealers would terminate their agreements. The third was the liquidation plan.

After the meeting, Shearman contacted Cleary to invite a bid for Hometown or the Company as a whole. On March 12, 2019, Lampert's "right hand guy" called

24

Powell. JX 230. He told Powell that Lampert would extend the Related-Party Agreements and was open to a transaction involving Hometown or the Company. Lampert's demand for a cash deposit had proved short-lived, and he did not use the Related-Party Agreements to put pressure on the Company.

Two days later, Powell reported to the Special Committee. He described his call with Lampert's second-in-command and told the Committee that if a transaction with Lampert did not materialize soon, Company management would likely recommend that the Board approve the Hometown liquidation.

The Special Committee authorized Powell to engage with Lampert. The Committee did not think any third-party bidders would be interested and, given the Company's distress, did not think it was an opportune time to sell to a third party.

## K. The March 20 Call And The Ensuing Negotiations

On March 20, 2019, Powell and Robbins spoke with Lampert. Powell asked Lampert to propose a transaction and explained that without a deal, Hometown would liquidate. Lampert misunderstood and thought the Company as a whole would liquidate. Lampert told Powell and Robbins that he wanted to consider a bid before that happened.

Three days later, Cleary had a call with Shearman. Cleary said Lampert thought the Company should announce publicly that it was exploring strategic alternatives and would liquidate if no transaction emerged. Shearman responded that the Special Committee did not want to make any announcement unless there was an agreed-upon transaction or a decision to liquidate Hometown. Shearman

25

clarified that the Company only planned to liquidate Hometown, with Outlet continuing as a standalone public company.

Cleary told Shearman that for a whole-Company transaction, Lampert "was thinking of a per share transaction price broadly equal to SHO's current trading price 'plus a normal M&A premium.'" JX 246. After consulting with the Special Committee, Shearman told Cleary that there was no interest in that option because the Committee had a very favorable view of the value of the Hometown-liquidation plan. Shearman said that the Committee remained interested in a Hometown-only transaction if Lampert "moved very quickly." JX 249.

After the call, Lampert and the Company entered into a non-disclosure agreement ("NDA"), and Lampert began due diligence.

### L. The March 27 Meetings

During a Board meeting on March 27, 2019, management reported that Hometown's outlook had not improved, even with the renewal of the Related-Party Agreements. An average of two dealers per week were asking to terminate their Dealer Agreements. Ninety-three additional Dealer Agreements would be up for renewal in June, and management thought most dealers would not renew.

Management then reviewed the three alternatives from the March 7 meeting. They thought option one—selling the Company as a whole or Hometown—was unlikely, because they did not believe an unaffiliated buyer would bid. They thought Lampert would bid, but he would offer less than what a liquidation could achieve.

Management thought that option two—restructuring the Dealer Agreements and making Hometown profitable—was a pipedream. Management did not see a way

26

to restructure the Dealer Agreements outside of Chapter 11 reorganization, and management thought a bankruptcy filing would harm the Company.

That left option three—the Hometown liquidation. Management thought it would solve the problems presented by the Hometown business, enable the Company to pay off its debt, and position the Company to operate Outlet going forward.

Management's assessment of the Hometown liquidation plan continued to rely on a series of optimistic assumptions, including:

- The liquidation would begin in April 2019 and last eight weeks.

- During that time, management would liquidate all 514 Hometown stores.

- The Company would recover 100% of cost on liquidated inventory in the Hometown stores, generating $124 million.

- The Company would incur only $4.9 million for lease settlements.

- Legal expenses would be $4.7 million.

- Severance and retention costs would be $4.2 million.

Management continued not to anticipate any claims for breach of the Dealer Agreements. When management first modeled a Hometown liquidation in December 2018, the plan assumed that a Holdings bankruptcy forced Hometown to liquidate. In that scenario, management reasoned that the Holdings' bankruptcy made it impossible or, at a minimum, commercially impracticable for the Company to perform under the Dealer Agreements, which would provide defenses to any claims for breach of contract. Management also thought that even if the dealers could prove breach, they could not prove causation or damages if the Holdings liquidation had caused the

breach. Based on those assumptions, management concluded that Company would not incur significant liabilities under the Dealer Agreements.

By March 27, 2019, Transform had acquired Holdings' assets, and a Holdings bankruptcy was off the table. The bankruptcy-related defenses were no longer available. But management did not update its assessment. Instead, management maintained that the Company would not incur any significant liabilities from liquidating Hometown. Sherman did not identify the issue either. At trial, O'Halloran conceded that he had not considered the potential consequences of intentionally breaching the Dealer Agreements. He also did not independently assess liability or damages. O'Halloran Tr. 385–93.

AlixPartners questioned management's expectation regarding sale proceeds, noting that the "cost recovery on liquidated inventory for Hometown segment seems high." JX 1138 at 2. AlixPartners also observed that management's projections were "based on past store liquidations which have mostly happened as mutually agreed terminations," but that in a non-consensual termination, "[a]ngry dealers could resort to stealing inventory, leading to greater shrinkage than expected." *Id*. At trial, O'Halloran agreed that was a risk. O'Halloran Tr. 392.

Solomon prepared a valuation presentation based on management's estimates. Solomon did not make any adjustments to management's liability estimates. In this litigation, however, Pitts acknowledged that "the traditional retailer . . . has hundreds of lease arrangements with landlords [and] if you just early terminate those leases, you're subject to massive damages[,] which you can't pay[,] which means you typically

28

go into bankruptcy." Pitt Dep. 78. He also acknowledged that in most retail bankruptcies, the lease obligations "usually take[] all the value . . . and prevent[] value flowing to shareholders." *Id.* at 79. He defended Solomon's failure to account for those liabilities by noting that the Company entered into the Dealer Agreements through a subsidiary, so he felt that the Company could liquidate the inventory, "take the money and leave, [and the] dealer has [to] deal with all the resulting liabilities if that dealer chooses to close that store because of our action." *Id.* at 79, 291. The corporate separateness of the subsidiary would give the Company arguments, but the obvious response would be a claim for tortious interference, and those arguments would be tested in potentially hundreds of individual arbitrations.

Relying on management's projections, Solomon "supported management's implementation of its proposed plan regarding the Hometown segment." JX 262. Management advised the Board to decide quickly, telling the directors: "Time is of the essence, as the Hometown segment's continued deterioration is having an impact on company liquidity and operating viability." JX 263 at 22.

The Board decided to give Lampert a final chance to acquire Hometown or the Company as a whole. The directors preferred a transaction with Lampert because it was a cleaner outcome. The directors also preferred a Hometown-only transaction based on the valuation management placed on Outlet. If the Company and Lampert could not agree on a transaction by April 15, 2019, then the Company would start the Hometown liquidation.

29

After the Board meeting, the Special Committee met on its own. The Committee instructed Shearman to tell Cleary that unless there was a deal by April 15, the Company would liquidate Hometown.

## M.     Lampert Argues Against The Hometown Exit Plan.

Shearman conveyed the Special Committee's message to Cleary, including the April 15 deadline. Cleary asked if Lampert could meet in person with management and Solomon. The meeting took place on April 1, 2019.

Lampert opened the meeting by acknowledging that he wore "two hats." JX 290; Lampert Dep. 272–73. Wearing one hat, he represented Transform. Wearing the other hat, he was the Company's majority stockholder He did not like the Hometown liquidation in either capacity.

Wearing his Transform hat, Lampert wanted to preserve Hometown. He thought that the Hometown business fit into "his strategy of a Sears with small stores and a unique consumer value proposition." JX 290.

Wearing his stockholder hat, Lampert thought liquidating Hometown would destroy value. He saw a big difference between closing tranches of stores and liquidating Hometown entirely. The former involved stores with expiring or mutually terminated Dealer Agreements, so there was no contract liability. The latter would breach the Dealer Agreements, give rise to contract liability, and create an antagonistic relationship with the dealers. A poor relationship with the dealers would make it more difficult to realize value from the inventory, because uncooperative dealers could undermine the liquidation effort.

30

Lampert also thought that Company management was underestimating the expenses associated with lease terminations and other costs. Lampert had not prepared a detailed analysis, but he did not need one. Lampert had spent decades in the retail industry. He served on the boards of AutoZone, AutoNation, Kmart, and Holdings. He had significant passive investments in Lands' End and Gap. He lived through the Kmart bankruptcy, witnessed the Toys-R-Us bankruptcy, and spent most of the preceding six months dealing with the Holdings bankruptcy. It was common knowledge in the industry that liquidating a large retail business outside of bankruptcy would be a disaster. Lampert was convinced that the Special Committee and its advisors were too bullish on the Hometown liquidation. Lampert thought a liquidation should only be considered if there were no alternatives.

Lampert also questioned whether Outlet could succeed on its own. He acknowledged that Outlet was achieving good results, but it lacked scale and had no track record. Lampert was not confident that its results were sustainable.

Management and Solomon did not have answers to these points. Lampert became concerned that no one had considered the real-world implications of a full-segment liquidation.

No one discussed valuation. Lampert ended the meeting by telling Powell, Bird, and Pitts that he would make an offer.

## N.    The $2.25 Offer

On April 3, 2019, Pitts contacted Lampert and told him that the Special Committee believed that a per share valuation in the "mid to high single digits" would

31

be warranted based on management's projections for the Hometown-liquidation plan. Dkt. 218 at 62–63. On the same day, the Company's stock price fell to $1.65.

Lampert was shocked by the Special Committee's ask. Given his own sense of the risks associated with a liquidation and the absence of any responses from management or Solomon to the points he made on April 1, Lampert thought the Committee was being completely unrealistic.

The Special Committee's deadline of April 15, 2019, meant that Lampert needed to make an offer quickly. So he did. On April 5, Transform submitted a written offer to buy the entire Company for $2.25 per share (the "$2.25 Offer"). The $2.25 Offer was conditioned on a favorable recommendation from the Committee. The $2.25 Offer was not conditioned on majority of the minority approval.

The offer letter pointed out that the proposal reflected a 23.6% premium to the Company's volume-weighted average price over the preceding five trading days. Lampert had not prepared a detailed valuation of the Company to support his offer. He simply thought that a 20–25% premium was "relatively standard," would "get their attention," and would be "productive in terms of having a negotiation and a dialogue." Lampert Tr. 76. Lampert believed that without a transaction, the Company was heading toward bankruptcy, where its value "would be a zero." *Id.* at 77.

The offer letter critiqued the Hometown liquidation strategy, citing "risks and uncertainties" associated with the plan, including costs that "[m]ay exceed

estimates." JX 309 at 6. The letter questioned whether Outlet could succeed as a standalone business, noting that:

- "Outlet business made no operating profit from FY2015 through FY2017." *Id.* at 4.

- "Growth in sales has been uneven." *Id.*

- "Outlet business faces long-term secular trends in the retail space." *Id.*

- "Small scale of Outlet business limits flexibility in the event of a downturn." *Id.*

- "Short-term retail and vendor contracts present recurring risks." *Id.*

On April 6, 2019, the Special Committee met to consider the $2.25 Offer. Solomon presented a valuation range of $5.96 to $9.58 per share for the Company's equity based on comparable public companies. Solomon presented a valuation range of $6.04 and $8.05 per share based on a discounted cash flow valuation. Both of those valuation ranges were "[b]ased on management projections for FY 2019 and FY 2020 . . . accounting for the effect of liquidating Hometown." JX 316 at 15. Without assuming the Hometown liquidation, the valuation range for the Company's equity based on comparable public companies was $0.00 to $0.40. *Id.*

The Special Committee decided to reject the $2.25 Offer. Through Shearman, the Special Committee told Lampert that his price "significantly missed the mark" and was "so far out of the range" that it provided no basis for a meaningful response. JX 325. Shearman reiterated the Committee's ultimatum that it would begin liquidating Hometown on April 15 absent a definitive agreement with Transform.

Lampert had thought that the $2.25 Offer would start a negotiation, and he wanted the Special Committee to respond at a minimum with pricing guidance for a

33

whole-Company sale. The Committee's hardline response made him think they was threatening to destroy value through a liquidation as a means of extracting a higher price from Transform.

Believing the Special Committee was taking an uncompromising position, Lampert thought he needed to be equally firm. He told Cleary that "the question now is whether the directors and advisors will determine what shareholders can and cannot do or whether it is the shareholders directly who can decide." JX 325.

Without a counteroffer or pricing guidance for a whole-Company sale, Lampert asked through Cleary if the Special Committee would consider a price for Hometown with a contingent value right tied to the performance of Outlet. Through Shearman, the Committee responded that it wanted to focus on a Hometown-only transaction.

## O.     The Company's Hometown-Only Proposal

On April 8, 2019, the Company and ESL publicly disclosed the $2.25 Offer and the Company's response. They also disclosed that they were continuing to negotiate.

On April 9, 2019, the Special Committee sent Lampert a term sheet for a Hometown-only transaction. It contemplated the Company selling Hometown's inventory for 76.58% of book value, with Lampert assuming responsibility for any liability associated with Dealer Agreements, the leases for the Company-owned stores, and any severance due to employees. Under those terms, Lampert would be taking on all the liabilities associated with a liquidation.

The Board met the next day. Management reported that there had been "no meaningful improvement" in the Hometown business. Management asserted that there was a need to take "decisive action relative to the Hometown segment" because

34

of the Company's deteriorating financial performance and the "increasing unlikelihood of a successful transaction with ESL." JX 346 at 14.

Management then reported that the Company's lenders had responded favorably to the plan for a Hometown liquidation. *Id.* at 24. Management anticipated that the lenders would agree to amend their loan documents so that the Company could proceed.

## P. Lampert Meets With The Directors.

Lampert interpreted the Special Committee's term sheet as an offer to sell the Hometown business, including all liabilities associated with the liquidation. He thought the attempt to shift all the liabilities to him implicitly acknowledged that the liquidation carried significant risk. Lampert did not think the term sheet provided a viable path. With the April 15 deadline less than a week away, he asked to meet with the Company's directors. A meeting was scheduled for April 12.

Lampert first met with the Board. He reminded the directors that he had "been a largely passive and supportive shareholder for this 7 year period of time," during which the Company's share price had declined from a high of $55.62 in May 2013 to $2.30 a month earlier. JX 905. That equated to a loss of $600 million for the ESL Funds from the high price, and a loss of over $150 million from the time of the rights offering in 2012. Lampert stressed that despite that terrible performance, he had never intervened. Now, however, he felt he had to make his position clear.

Lampert described the Hometown liquidation as a disaster in the making that he unequivocally opposed. He also had doubts about Outlet's prospects as a standalone company, given its small size and inconsistent performance. He expressed

35

disappointment that the Board had not pursued alternatives to extend the Company's runway by raising new capital through a rights offering or third-party investment. After Lampert's remarks, everyone stayed silent. *See* O'Halloran Tr. 357–58.

Lampert then met with the Special Committee, where he reiterated his points. This time, Robbins and Phelan engaged. During the discussion, Lampert expressed interest in acquiring Hometown's inventory for 62.5% of book value. JX 356; O'Halloran Tr. 419. He also offered to modify the $2.25 Offer to add a contingent value right that would pay out another $0.75 per share if the Outlet business achieved $30 million or more in adjusted EBITDA in 2019. JX 356 at 1. He stressed that he thought it was inappropriate to force through a value-destroying liquidation over the objection of the Company's majority stockholder. Lampert Tr. 119–20; Lampert Dep. 127–29.

Later that day, the Special Committee reconvened with its advisors. They decided to reject both of Lampert's offers and to counter with a proposal for a whole-company sale at $9.50 per share. JX 359 (the "$9.50 Ask").

Pitts delivered the message. He made a point of saying that the ask was not coming from him, which made Lampert think that even Pitts thought the number was unrealistic. Lampert Tr. 123.

The $9.50 Ask demanded more than a 300% premium over market for a company that had lost money for the past five years and had not traded near that price since 2015. Lampert thought the figure was "inexplicable." Lampert Tr. 117

Pitts confirmed that unless a deal was reached with Lampert, then the Company would proceed with the Hometown liquidation without a stockholder vote.

36

Lampert responded that in that case, he needed to consider "what options might be available to him, given his status as the Company's majority stockholder, to prevent the Company from effecting a liquidation of the Hometown segment over his objections." JX 372.

**Q.    Lampert Intervenes.**

When the Special Committee had first raised the Hometown liquidation plan and imposed the April 15 deadline, Lampert thought it was a negotiation tactic. He did not believe that anyone actually thought it was possible to liquidate a retail business outside of bankruptcy. But as the discussions unfolded, Lampert came to believe that the Special Committee was serious. After the $9.50 Ask, Lampert decided that the Special Committee intended to move forward with the Hometown liquidation. Lampert Tr. 122–23.

Lampert was serious too. He firmly believed that the Hometown liquidation would be a disaster for the Company and its stockholders. Since he owned a majority of the stock, he would suffer the most.

Lampert decided that that he needed to prevent the Hometown liquidation. On April 15, 2019, he took action by written consent as the holder of a majority of the Company's common stock (the "Controller Intervention").

First, Lampert amended the Company's bylaws to require that a Hometown liquidation receive approval from 90% of the Board, at two separate Board votes, taken at least thirty business days apart (the "Bylaw Amendment"). If the liquidation received the necessary vote at the first meeting, then the Bylaw Amendment required that the Board disclose the result to the stockholders. The Bylaw Amendment

37

technically did not prevent the Board from pursuing the Hometown liquidation. As a practical matter, it created a window during which Lampert could take additional action before the second meeting to stop the Hometown liquidation from happening. Lampert responsibly acknowledged at trial that he had no intention of letting the Hometown liquidation happen. *See* Lampert Tr. 136–40.

Second, Lampert removed Phelan and Robbins from the Board, which had the effect of also removing them from the Special Committee (the "Director Removal"). At trial, Lampert was refreshingly candid about his reasoning: Phelan and Robbins had been the most vocal when he met with the Committee; he thought they were driving the $9.50 Ask, and he thought they were obstacles to a deal. Lampert Tr. 122–23.

Lampert filled the resulting vacancies with Alberto Franco and John Tober. Lampert selected them at the suggestion of Stephen Freidheim, the Chief Investment Officer and Managing Partner of Cyrus Capital Partners. Freidheim was Lampert's friend, and Cyrus had provided the bulk of the financing for Transform to buy Holdings' assets. Lampert could be confident that Franco and Tober would support his interests, even without any direct ties between them.

Lampert announced the Controller Intervention in a letter to stockholders. He expressed his strong disagreement with the Hometown liquidation and argued that it would have destroyed value. He also argued that the plan to operate Outlet on its own created "significant risk should the Outlet segment's recent one-year profit performance prove ephemeral." JX 401 at 1. He explained that the Controller Intervention protected the Company by preserving its relationships with the

38

Hometown dealers, who had a "vested interest in seeing the Hometown business remain operating," and whose Dealer Agreements would have been breached by the Hometown liquidation *Id.*

For Lampert, the Controller Intervention was a drastic move. He had never done anything similar at any of his companies. He testified credibly that the Special Committee left him with no choice. He saw no hope of reaching agreement with the Special Committee given the $9.50 Ask and the April 15 deadline. From his standpoint, the Controller Intervention prevented a value-destroying mistake. Lampert Tr. 134–36.

For the Board and management, the Controller Intervention took the Hometown liquidation off the table. Management thought that any liquidation had to be announced and completed quickly, because if the Company delayed a liquidation after announcing it, then dealers could "do inappropriate things" with inventory or abandon their stores. O'Halloran Tr. 366. The Bylaw Amendment made a rapid liquidation impossible.

## R.   Negotiations Resume.

The Controller Intervention ended the first phase of the negotiations between the Company and Lampert. Longino thought the Controller Intervention was "unfair and frustrating and inappropriate." Longino Dep. 88. He also could not understand why he was "singled out" to stay rather than being removed as well. *Id.* at 101. He thought all three of the Special Committee members had been on the same page. *Id.*

After the Controller Intervention, Longino thought the cards were stacked against him. *Id.* at 101–02. He worried about personal liability if he stayed on as a

39

director, but he ultimately saw himself as a last "line of defense against Mr. Lampert." *Id.* at 102. He also was concerned about Tober and Franco's independence and thought he was in the best position to get the best deal possible for the Company and its minority stockholders. At bottom, he felt he had "made a commitment" to serve on the Special Committee and wanted to see it through. *Id.* By email dated April 18, 2023, Longino informed the Board that he would continue as the sole member of the Special Committee. *See* JX 421.

Shearman prepared a list of options for Longino to consider. JX 419. One involved suing Lampert to invalidate the Bylaw Amendment. Longino decided against it because a legal challenge "might take a year or more," would come at "a significant cost," and had uncertain chances of success. Longino Dep. 90, 92–93. Another option was to pursue the Hometown liquidation in compliance with the Bylaw Amendment. Longino did not think that Lampert would allow that.

The final option was to resume negotiations. That seemed like the only realistic path, so Longino instructed Pitts to contact Lampert and inform him that the Company continued to view a Hometown-only transaction as the best path forward. JX 419 at 2. Meanwhile, the Board continued to discuss potential next steps with respect to both a whole-company sale and a Hometown-only transaction.

Lampert wanted to prioritize a whole-company sale. The two sides began exploring why their valuations of the Company were so far apart. The big difference was Outlet. Lampert Tr. 161.

Lampert realized that the two sides were not likely to compromise on their views of Outlet, so he again proposed a whole-company sale plus a contingent value right for Outlet. The Special Committee suggested a whole-company sale that included a go-shop for Outlet. Lampert liked that structure.

The Special Committee made clear that it wanted a go-shop in which a third-party would have a clear path to success. That meant that if the bidding reached a threshold price, then Outlet could be sold without any match right. Lampert wanted a floor price, because his $2.25 Offer attributed value to Outlet.

Lampert proposed that the Company would have seventy-five days to solicit bids for Outlet, then anyone making an offer would have forty-five days to enter into a signed agreement. He envisioned a floor price of $103 million and a matching right for any bid up to $125 million.

The resulting negotiations involved four main deal points: the base price for the Company, the threshold price for the Outlet sale at which the stockholders would receive more consideration, the length of the go-shop, and the ceiling for Lampert's matching right. The Special Committee wanted a higher base price, a lower threshold price, and a longer shopping period. Lampert refused to increase the base price, which remained at $2.25 per share. For the threshold price, the Special Committee countered at $92.3 million, and the two sides compromised at $97.5 million. On the shopping period, they compromised on eighty-four days with one ten-day extension.

The ceiling for Lampert's matching right presented an interesting problem. If there was no ceiling, or if the ceiling was too high, then a third-party might not bid,

because the third-party would expect Lampert to match any competing bid up to the point where the competitor overpaid. Having a reasonable ceiling was thus good for the Company and its stockholders, because it would give third parties the confidence to bid. But if there was only one competing bidder, then the bidder might only face competition up to the ceiling, so too low a ceiling could leave value on the table. The Special Committee decided that too high a matching right was a bigger risk than too low a matching right, particularly because the ceiling would only be a problem if there was only one competing bidder. If there were multiple bidders, they would compete among themselves. The Committee sought to cap Lampert's match right at $115 million. The two sides compromised at $120 million.

## S.    The Merger Agreement

On May 31, 2019, the Special Committee and the Board approved the final merger agreement (the "Merger Agreement" or "MA"). The Committee met first. Pitt gave a valuation presentation and orally rendered Solomon's opinion, later confirmed in writing, that the consideration was fair to the minority stockholders from a financial point of view. In reaching that conclusion, Solomon assumed that the Company could not pursue a Hometown liquidation.

As the sole member of the Special Committee, Longino approved the transaction and recommended it to the Board. After the Special Committee met, the Board convened. Pitts again presented Solomon's analysis and fairness opinion, Longino conveyed the Committee's recommendation, and the Board approved the Merger Agreement.

42

The Merger Agreement did not condition the transaction on a majority of the minority vote. The Merger Agreement also did not give the Board the right to terminate the agreement to accept a superior proposal.

## T. The Outlet Go-Shop And Sale

Under the Merger Agreement, the Company had the right to control the go-shop. The Merger Agreement gave the Company until August 24, 2019, to enter into a definitive agreement to sell Outlet to a third party. As agreed, Lampert could match any third-party bid up to $120 million. After the bidding reached $120 million, Lampert could continue, but because the matching right no longer applied, the Company could commit to a sale to a third-party. Lampert agreed to support any Outlet sale above the floor price of $97.5 million.

On June 3, 2019, the Company announced the Merger Agreement and the start of the Outlet go-shop. Over the next two weeks, Solomon contacted 135 potential purchasers, with seventeen entering into confidentiality agreements.

On June 11, 2019, Vintage Capital Management LLC submitted a letter of intent. Powell viewed Vintage as a serious bidder and told the Board that management "like[s] Vintage Capital a lot." JX 590.

On June 21, 2019, the Company agreed to two weeks of exclusivity with Vintage based on an indicative price for Outlet of $130 million. On August 12, Vintage had one of its affiliates submit a revised proposal for $121 million. The lowered bid

came after the Company reported second-quarter earnings that fell below expectations.

The new price was just $1 million over the point where Lampert's matching right lapsed. Lampert did not think that was a coincidence. Nevertheless, he did not compete for Outlet.

On August 27, 2019, the Company entered into an agreement to sell Outlet to a different Vintage affiliate for base consideration of $121 million plus adjustments that brought the total consideration to $131,296,478. That translated into additional consideration of $0.96 per share for stockholders.

Both parts of the deal closed on October 23, 2019 (the "Transaction"). The Company's stockholders received total consideration of $3.21 per share. That value represented a premium of 76% over the five-day volume-weighted average price of the Company's common stock before the announcement of the $2.25 Offer.

## U.    This Litigation

After the announcement of the Transaction, two stockholder plaintiffs filed putative class actions challenging its terms, and a third stockholder sought books and records. After the inspection was completed and the Transaction closed, the stockholders consolidated their claims in a single lawsuit.

Meanwhile, another Company stockholder sought appraisal. The court entered an order coordinating the plenary action and the appraisal action for purposes of discovery. During discovery, the plaintiffs dismissed their claims against Powell, Bird, and a third Company director, James Gooch, without prejudice.

In January 2023, the plaintiffs agreed to settle their claims against Linden, Franco, and Tober in exchange for a payment to the class of $3.1 million. The case proceeded to trial against Lampert and his affiliates.

On November 3, 2023, the court held a hearing to approve the partial settlement. During the hearing, plaintiffs' counsel described the conflicts of interest that they thought Linden, Franco, and Tober faced. Plaintiffs' counsel acknowledged that there was no direct evidence indicating that any conflicts affected the Board's decision-making or the terms of the Transaction. *See* Dkt. 269 at 10–12. The court entered an order approving the partial settlement on November 4. Dkt. 268.

## V. The Company's Bankruptcy

Meanwhile, on December 12, 2022, the Company filed a voluntary petition for bankruptcy. The automatic stay brought the appraisal claim to a halt, leaving only the breach of fiduciary duty claims.

The Company attempted to reorganize under Chapter 11, but the proceeds generated by its inventory sales were substantially less than expected, and the Company converted the proceeding to a Chapter 7. The Company's unsecured creditors and stockholders are likely to receive nothing.

The Company achieved lower-than-expected proceeds while attempting to liquidate only 121 stores under the protection of the bankruptcy code. Company management had anticipated generating significantly higher net proceeds while liquidating approximately 500 stores outside of bankruptcy.

45

## II. LEGAL ANALYSIS

The plaintiffs contend that Lampert breached his fiduciary duties by engaging in the Controller Intervention and forcing the Company into the Transaction.

Lampert proved that that the Controller Intervention was a reasonable response to the threat posed by the liquidation strategy. He did not breach his fiduciary duties by engaging in the Controller Intervention.

If events had stopped with the Controller Intervention, and if the Company could have continued on a status quo path, then judgment would be entered for the defendants. But events continued to develop, with Lampert and the Special Committee negotiating the Transaction, which eliminated the Company's minority stockholders from the entity.

Lampert failed to prove that the Transaction was entirely fair. As a self-dealing fiduciary, he is liable for the resulting unfairness regardless of his mental state. Although he subjectively believed that the Transaction was entirely fair, that is not sufficient.

### A. The Controller Intervention

The plaintiffs contend that Lampert breached his fiduciary duties as a controller by engaging in the Controller Intervention. Lampert had the corporate power as the holder of shares carrying a majority of the Company's voting power to engage in the Controller Intervention. But under Delaware law, every corporate act must be twice tested, once at law and again in equity.

Because Lampert owned over 50% of the Company's voting power, he controlled the Company and owed fiduciary duties to the Company and the minority

stockholders.[7] The parties agree on that point, but little else. They disagree on the scope of the duties that Lampert owed. They disagree over how a court analyzes the action that Lampert took. And they disagree over whether Lampert breached his duties.

### 1. The No-Interference Theory

The plaintiffs contend that the Controller Intervention constituted a breach of duty simply because Lampert prevented the Special Committee from pursuing the Hometown liquidation. As the plaintiffs note, Section 141(a) empowers a board of directors to manage and oversee the business and affairs of a Delaware corporation. 8 *Del. C.* § 141(a). From that indisputable premise, they contend that unless the DGCL affords stockholders a vote on a particular issue, the board's decision must be

---

[7] *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (observing that a stockholder becomes a fiduciary if it "owns a majority interest in or exercises control over the business affairs of the corporation" (internal quotation marks omitted)); *Ivanhoe P'rs v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987) ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation."); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–10 (Del. 1952) ("Plaintiffs invoke the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property."); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) ("Under our law, a controlling shareholder exists when a stockholder . . . owns more than 50% of the voting power of a corporation . . . ."); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("A shareholder is a 'controlling' one if she owns more than 50% of the voting power in a corporation . . . ."). *See* Am. L. Inst., *Principles of Corporate Governance: Analysis and Recommendations* § 1.10(a) (1994) (defining controlling stockholder as a person who has the power to vote more than 50% of the outstanding voting equity or "[o]therwise exercises a controlling influence over the management or policies of the corporation or the transaction or conduct in question by virtue of the person's position as a shareholder.").

47

respected and protected from stockholder interference. They conclude that if a majority stockholder uses its voting power to block a board from pursuing its chosen course of action, then the intervention is inherently inequitable and constitutes a breach of duty because it trespasses on the space reserved for director action.

Contrary to the plaintiffs' position, a majority stockholder can use its voting power as Lampert did. In *Frantz*,[8] a majority stockholder adopted a bylaw that required board unanimity before the board could act. Like the Bylaw Amendment, the *Frantz* bylaw prevented the incumbent board from pursuing the path the directors believed was in the corporation's best interest—there, diluting the controller to deprive it of control. In a brief and elliptical decision, the Delaware Supreme Court stated that the bylaw amendment was both permissible under the DGCL and equitable under the circumstances.[9]

Although the outcome was different, this court's decision in *Hollinger v. Black*[10] confirms that a controller intervention is not inequitable *per se*. Conrad Black, the controlling stockholder of Hollinger International, had committed in writing to support a sale process overseen by the Hollinger's board. Black subsequently sought to implement a different transaction that was in his own best interest, and he adopted an unanimity bylaw to block the board from countering his efforts. Chief Justice

---

[8] Frantz Mfg. Co. v. EAC Indus. Inc., 501 A.2d 401 (Del. 1985).

[9] *Id.* at 407.

[10] *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022 (Del. Ch. Feb. 26, 2004), *aff'd*, 872 A.2d 559 (Del. 2005)

Strine, writing while a Vice Chancellor, did not reject the intervention as *per se* improper. The Chief Justice evaluated whether it violated the strictures of equity. On the facts presented, he concluded that the bylaw was inequitable,[11] but that is different than a *per se* determination.

*Frantz* and *Hollinger* defeat the plaintiffs' bright-line rule. A controller can exercise its stockholder-level muscle, subject to Professor Berle's two-part test:

> [I]n every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.[12]

"A reviewing court's role is to ensure that the corporation complied with the statute *and* [that the fiduciaries] acted in accordance with [their] fiduciary duties."[13] A controller intervention is not inequitable and invalid *per se.* It depends on the facts.

## 2. The Role Of Fiduciary Duties When A Majority Controller Exercises Stockholder-Level Rights.

*Frantz* and *Hollinger* teach that a majority controller can use its voting power to block board action and that some level of equitable review will apply. Neither decision provides an explicit framework for conducting the equitable analysis. Resolving this case requires delving deeper into when a controller owes fiduciary

---

[11] *Id.* at 1080–82.

[12] Adolf A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931).

[13] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) (emphasis added).

duties, what duties the controller owes, and how a court should review the exercise of controller power for compliance with those duties.

Although Delaware decisions have not emphasized the distinction, there are two separate contexts in which controller action can implicate fiduciary duties. The most familiar context involves a controller using its influence over the board and management to wield corporate power indirectly and cause the corporation to act. Having effectively moved into the boardroom, the controller becomes subject to the same fiduciary standards that apply to directors.[14] The Controller Intervention does

---

[14] *Thorpe v. CERBCO, Inc. (Thorpe I)*, 1995 WL 478954, at *8 (Del. Ch. Aug. 9, 1995) (Allen, C.) ("[C]ontrolling shareholders are prohibited from *exercising corporate power* (either formally as directors or officers or informally through control over officers and directors) so as to advantage themselves while disadvantaging the corporation."), *aff'd in part, rev'd in part on other grounds*, *(Thorpe II)* 676 A.2d 436 (Del. 1996); *Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134, at *19–20 (Del. Ch. June 24, 1991) (Allen, C.) ("[W]hen a shareholder, who achieves power through the ownership of stock, exercises that power by directing the actions of the corporation, he assumes the duties of care and loyalty of a director of the corporation."), *aff'd in part, rev'd in part on other grounds sub nom. Cede & Co. v. Technicolor, Inc. (Technicolor Plenary II)*, 634 A.2d 345 (Del. 1993); *Harris v. Carter*, 582 A.2d 222, 234 (Del. Ch. 1990) (Allen, C.) ("[W]hen a shareholder presumes to exercise control over a corporation, to direct its actions, that shareholder assumes a fiduciary duty of the same kind as that owed by a director to the corporation."); *Epstein v. Celotex Corp.*, 238 A.2d 843, 847 (Del. Ch. 1968) ("When, in the conduct of the corporate business, a majority of the voting powers in the corporation join hands in imposing its policy upon all . . . they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon the directors in their relation to all the stockholders.") (citing *Allied Chem. & Dye Corp. v Steel & Tube Co.*, 120 A. 486, 191 (Del. Ch. 1923)); *accord Southern Pac. Co. v. Bogert*, 250 U.S. 483, 487–88 (1919) ("The majority has the right to control; but when it does so, it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors."); 18 C.J.S. *Corporations* § 394 ("When a stockholder exercises control over the corporation by directing its actions, the stockholder assumes the same fiduciary duties as those owed by a director to the corporation."); *see* Adolf A. Berle, *"Control" in Corporate Law*, 58 Colum. L. Rev. at 1222 (1958) ("[T]he law has long recognized

50

not implicate that fiduciary framework. When Lampert amended the Company's bylaws and removed directors, he only used his powers as a stockholder.

Delaware cases have not uniformly addressed the fiduciary framework that applies when a controller exercises stockholder-level rights. Instead, there are competing strains of authority.

The analysis is complicated because non-controlling stockholders can exercise stockholder rights free of fiduciary constraint. A share of stock is a form of intangible property that reifies a bundle of rights that its holder can exercise.[15] The three most familiar are the rights to sell, vote, and sue.[16]

Based on the general rule that non-controlling stockholders can exercise those rights free of constraint, some Delaware decisions assert that a controller can exercise those stockholder-level rights free of fiduciary constraint as well.[17] But other

_____

and imposed certain liabilities on the holders of control if they use their influence over directors to cause specific corporate action. Briefly stated, the risk is that where holders of control, without assuming the title of directors, move into the directors' room or the managerial offices and specifically direct corporate action, they are held to the same standards of conduct which apply to directors.").

[15] *See Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 679 (Del. 2020); *Colon v. Bumble, Inc.*, — A.3d —, —, 2023 WL 5920100, at *4 (Del. Ch. Sept. 12, 2023).

[16] *New Enter. Assocs. 14 L.P. v. Rich*, 295 A.3d 520, 570 (Del. Ch. 2023).

[17] Most notably, Chancellor Allen's later decisions adopted that stance. For example, in *Thorpe I*, he distinguished a situation in which controllers exercised corporate power "either formally as directors or officers or informally through control over officers and directors" from a situation where controllers voted or sold their shares *qua* stockholders, asserting that "[w]here they exercise no power over the corporation to facilitate their own sale, (putting aside questions of inside information under federal securities law) they are privileged to sell their shares for what they can get, even while the corporation itself is selling its stock." *Thorpe I*, 1995 WL 478954,

Delaware decisions assert that fiduciary duties apply in this setting, because the controller's ability to act solely in its own interest as a stockholder "must yield, however, when a corporate decision implicates a controller's duty of loyalty."[18]

Delaware decisions involving the right to sell and the right to vote disconfirm the assertion that controllers never owe fiduciary duties when acting in their stockholder capacities. They also disconfirm the assertion that controllers owe director-equivalent fiduciary duties of loyalty and care when exercising stockholder rights. A controlling stockholder owes fiduciary duties when exercising stockholder powers, but not the same duties a director owes.

at *7. In a footnote, Chancellor Allen had to acknowledge that there are, in fact, equitable constraints on a controller's ability to exercise those rights. *Id.* at *7 n.14. Chancellor Allen included similar assertions in other decisions. *E.g.*, *Freedman v. Rest. Assocs. Indus., Inc.*, 1990 WL 135923, at *6 (Del. Ch. Sept. 19, 1990) ("Thus, a shareholder, even a majority shareholder, has discretion as to when to sell his stock and to whom, and I find no basis for holding the management group liable to plaintiffs for exercising that discretion *qua* shareholder."). In *Thorpe II*, the Delaware Supreme Court reversed his holding that the controllers had an absolute right to vote against a sale of assets. 676 A.2d at 442. As discussed below, other decisions also disconfirm the formalistic position.

[18] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *22 (Del. Ch. Mar. 26, 2018); *see Adams v. Clearance Corp.*, 121 A.2d 302, 306 (Del. 1956) ("When the directors, or the majority stockholders, exercise a power that the general corporation law confers upon them, it is competent for anyone who conceives himself aggrieved thereby to invoke the processes of a court of equity for protection against its oppressive exercise." (cleaned up)).

### a. The Right To Sell

Delaware decisions have addressed a controller's duties when deciding whether to sell. A controller does not owe enforceable duties when declining to sell. A controller owes limited but enforceable duties when deciding to sell.

The governing authority is *Bershad v. Curtiss-Wright Corp.*[19] There, the Delaware Supreme Court stated that "[c]learly, a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority." *Id.* at 845. Applying that rule, the justices rejected a stockholder's claim that a controller breached its duties by engaging in a squeeze-out rather than exploring a sale of the company to a third party. By using the phrase "no duty," the *Bershad* court indicated that—at least on the facts presented—the controller could refuse to sell free of fiduciary constraint. But by stating that no duty to sell existed "merely because the sale would profit the minority," the *Bershad* court left open the possibility that a controller might have a duty to sell in other situations. Subsequent Delaware decisions, however, have treated the absence of any obligation to sell as absolute.[20]

---

[19] 535 A.2d 840 (Del. 1987).

[20] *Buttonwood Tree Value P'rs, LP v. Sullivan*, 126 A.3d 643, 2015 WL 6437218, at *1 (Del. 2015) (TABLE) ("As a controlling stockholder of Central Steel, the trust was entitled to refuse to sell its 62.1% stake in Central Steel and control of Central Steel could therefore not pass without its consent."); *Peter Schoenfeld Asset Mgmt. LLC v. Shaw*, 2003 WL 21649926, at *1 (Del. Ch. July 10, 2003) ("Hughes, as a controlling stockholder, had no duty to sell its [company] shares."), *aff'd*, 840 A.2d 642 (Del. 2003); *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906, at *12 (Del. Ch. Sept. 3, 1996) ("A majority stockholder in a Delaware corporation owes no duty to sell its holdings in the

The situation is different when a controller decides to sell. By the end of the

first half of the twentieth century, courts in other jurisdictions had held that directors

could breach their duties by selling their offices, *viz.* by first transferring their shares

to a buyer for an above-market price, then adding the buyer's representatives to the

board, and finally resigning from their positions to leave the buyer's representatives

in control.[21] Several of the cases involved new owners who looted the corporation.[22]

Building on those precedents, courts held that a controlling stockholder was subject

to fiduciary duties when selling its shares and could breach those duties by knowingly

selling to a looter or being grossly negligent in doing so.[23]

---

corporation just because the sale would profit the minority."); *Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994) ("No part of [the Carroll family's] fiduciary duty as controlling shareholders requires them to sell their interest."); *Freedman*, 1990 WL 135923, at *6 ("Thus, a shareholder, even a majority shareholder, has discretion as to when to sell his stock and to whom, and I find no basis for holding the management group liable to plaintiffs for exercising that discretion *qua* shareholder."). Earlier Delaware case law was not so clear on this point. In *Epstein v. Celotex Corp.*, for example, Chancellor Marvel, writing when a Vice Chancellor, contemplated that a majority stockholder's "higher duty to the public stockholders" might require it to vote in favor of a sale of assets, but concluded that the controller had "lived up to such duty" by acting fairly. *Epstein*, 238 A.2d at 847.

[21] *E.g.*, *Insuranshares Corp. v. N. Fiscal Corp.*, 35 F. Supp. 22, 24–25 (E.D. Pa. 1940); *Backus v. Finkelstein*, 23 F.2d 357, 359 (D. Minn. 1927); *Forbes v. McDonald*, 54 Cal. 98, 100 (1880); *Gerdes v. Reynolds*, 28 N.Y.S.2d 622, 660–61 (Sup. Ct. 1941); *Porter v. Healy*, 91 A. 428, 431 (Pa. 1914).

[22] *E.g.*, *Insuranshares*, 35 F. Supp. at 24–25; *Gerdes*, 28 N.Y.S.2d at 660–61.

[23] For a time, the law seemed poised to progress further. Writing in the midcentury, Professor Berle and Gardiner Means argued in *The Modern Corporation and Private Property* that "the power going with 'control' is an asset which belongs only to the corporation; and that payment for that power, if it goes anywhere, must go into the corporate treasury." Adolf A. Berle, Jr. & Gardiner C. Means, *The Modern Corporation and Private Property* 244 (1933). A couple of mid-century decisions

When the Court of Chancery confronted the issue at the end of the twentieth century, it adopted the no-sale-to-a-looter doctrine.[24] But the Delaware cases included odd twists. Chancellor Allen first addressed the doctrine in *Harris*,[25] holding that a plaintiff had stated a claim by alleging that a controlling stockholder had breached its duty of care by selling its control block without investigating whether the buyer posed a threat to the corporation. He took pains, however, to ground the care-based obligation on the general duty that anyone in society owes to every other person, and he expressly analogized the controller's alleged misconduct to a negligent driver who injures her passenger in a collision. *Id.* at 235. That analytical step only makes sense if there is doubt—not openly expressed in the decision—about whether a controller owes fiduciary duties when selling a control block. Ironically, shifting away from the fiduciary framework subjects the controller to liability for negligence, rather than the

---

endorsed that rule. *E.g.*, *Perlman v. Feldmann*, 219 F.2d 173, 176–78 (2d Cir. 1955) (holding that the President and Chairman of the board of directors of Newport Steel Corporation, who also controlled 33% of its voting power, breached his fiduciary duties by selling his shares at a premium such that the corporation was entitled to damages equal to the difference between the price paid for the shares with the control premium and the value of shares "without the appurtenant control"); *Honigman v. Green Giant Co.*, 208 F. Supp. 754, 757–58, 762 (D. Minn. 1961), *aff'd*, 309 F.2d 667 (8th Cir. 1962), *cert. denied*, 372 U.S. 941 (1963). But they were not widely followed, and courts returned to the rule that a controller only would breach its duties when selling by knowingly or negligently transacting with a looter. *E.g.*, *Swinney v. Keebler Co.*, 480 F.2d 573, 577–78 (4th Cir. 1973).

[24] *See Ford v. VMware, Inc.*, 2017 WL 1684089, at \*9–13 (Del. Ch. May 2, 2017); *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 758–62 (Del. Ch. 2006); *In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at \*6 (Del. Ch. Sept. 29, 2005); *Harris*, 582 A.2d at 233–36.

[25] 582 A.2d at 236.

higher gross negligence standard that governs the fiduciary version of the claim. Subsequent decisions accepted the fiduciary framework and agreed that the duty of loyalty applied, but questioned whether a controller could be liable for breaching its duty of care when selling to a looter, particularly if the corporations' certificate of incorporation held an exculpatory provision.[26] The most recent decision accepts the fiduciary framework for both loyalty and care. *VMware, Inc.*, 2017 WL 1684089, at *9–12.

The sale-to-a-looter cases demonstrate that a controller owes fiduciary duties when selling its shares. A controller can say "no" to a sale, thereby maintaining the status quo, without engaging in a fiduciary act. An affirmative sale, however, implicates the controller's fiduciary duties, albeit to a limited degree.

---

[26] *Abraham*, 901 A.2d at 759; *In re CompuCom*, 2005 WL 2481325, at *6–8, 7 n.40. Extending exculpation to controllers runs contrary to the plain language of Section 102(b)(7), which only applies to directors and officers. 8 *Del. C.* § 102(b)(7); *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 285–87 (Del. Ch. 2021); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004). Some decisions argue for extending exculpation to controllers under an agency rationale, but that approach runs contrary to how Delaware law treats the relationship between stockholders and directors. *See Presidio*, 251 A.3d at 286–87. "It also is possible that a controller could cause a corporation or its unaffiliated stockholders to suffer harm by exercising control through means other than its director nominees," leaving no basis for exculpation to apply. *See id.* at 287. That would logically be the case with a block sale, where the controller takes action on its own, without any inherent need to act indirectly through officers and directors. *Id.* In the field of entity law, Delaware decisions have equated gross negligence with recklessness. *Id.* As a policy matter, it does not seem problematic to hold a controller accountable for recklessly selling to a looter.

### b.    The Right To Vote

For the right to vote, Delaware cases apply principles paralleling the right to sell. A controller does not owe any enforceable duties when declining to vote or when voting against a change to the status quo. A controller owes limited but enforceable duties when voting to change the status quo.

Over the decades, the Delaware Supreme Court has issued a series of decisions addressing the standard for controller stockholder voting. Perhaps the best-known passage comes from *Bershad*, where the justices stated: "Stockholders in Delaware corporations have a right to control and vote their shares in their own interest. *They are limited only by any fiduciary duty owed to other stockholders.* It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, *so long as they violate no duty owed other shareholders.*" 535 A.2d at 845 (emphasis added). Many lawyers are familiar with the references to voting as "determined by whim or caprice." Few seem to remember or cite the references to voting being limited "by any fiduciary duty owed to other stockholders." Defense counsel in this case quoted the passage from *Bershad* without including the portion of the quotation that references compliance with fiduciary duties. Dkt. 230 at 54–55. That happens far too often.

*Bershad*'s fiduciary limitation on the right to vote did not appear out of thin air. Chancellor Josiah O. Wolcott first expressed a version of it in 1930, when he explained that "stockholders have the right to exercise wide liberality of judgment in the matter of voting and may admit personal profit or even whims and caprice into the motives which determine their choice, so long as no advantage is obtained at the

57

expense of their fellow stockholders."[27] In 1947, the Delaware Supreme Court replaced "no advantage" with "no duty," stating: "Generally speaking, a shareholder may exercise wide liberality of judgment in the matter of voting, and it is not objectionable that his motives may be for personal profit, or determined by whims or caprice, *so long as he violates no duty owed his fellow shareholders." Ringling Bros.-Barnum & Bailey Combined Shows v. Ringling*, 53 A.2d 441, 447 (Del. 1947) (emphasis added). In 1977, the high court summarized the history of Delaware law on majority stockholder voting as follows:

> In sum, for more than fifty years our Courts have held, consistent with the general law on the subject, that a stockholder in a Delaware corporation has a right to vote his shares in his own interest, including the expectation of personal profit, *limited, of course, by any duty he owes to other stockholders.*

*Tanzer v. Int'l Gen. Indus., Inc.*, 379 A.2d 1121, 1124 (Del. 1977) (emphasis added), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701, 704 (Del. 1983) (overruling business purpose test).

---

[27] *Heil v. Standard Gas & Elec. Co.*, 151 A. 303, 304 (Del. Ch. 1930). Chancellor Wolcott had previously held that when a majority stockholder or control group exercises its voting power "to impose their will upon the minority in a matter of very vital concern to them," then the Court of Chancery must evaluate whether "the power is used in such a way that it violates any of those fundamental principles which it is the special province of equity to assert and protect." *Allied Chem. & Dye Corp.*, 120 A. at 491. The *Allied Chemical* case involved a sale of assets that the majority stockholder had the statutory right to approve, but Chancellor Wolcott held that fiduciary review was still warranted: "Notwithstanding that the right of the majority to sell all the assets is given by the statute, yet if the proposed sale is a fraud on the minority, it cannot stand." *Id.*

Nor did the Delaware Supreme Court back away from this point after *Bershad*. In *Stroud v. Grace*, the Delaware Supreme Court gave broad effect to the ratifying vote provided by a controlling stockholder, yet qualified that endorsement with a reference to the controller's duties: "The fact that controlling shareholders voted in favor of the transaction is irrelevant *as long as they did not breach their fiduciary duties to the minority holders*." 606 A.2d 75, 83–84 (Del. 1992) (emphasis added).

Most notably, in *Thorpe II*, the high court reversed Chancellor Allen's assertion that the majority controllers owed no duty when voting against a sale of assets:

> The shareholder vote provided by § 271 does not supersede the duty of loyalty owed by control persons, just as the statutory power to merge does not allow oppressive conduct in the effectuation of a merger. Rather, this statutorily conferred power must be exercised within the constraints of the duty of loyalty.

676 A.2d at 442 (first citing *Bershad*, 535 A.2d at 845; then citing *Ringling Bros-Barnum & Bailey*, 53 A.2d at 447). The justices acknowledged that "the duty of a controlling shareholder/director will vary according to the role being played by that person and the stage of the transaction at which the power is employed," but they did not adopt the capacity-based concept of non-fiduciary action. *Id.* On the facts presented, the Delaware Supreme Court held that the controllers breached their fiduciary duties by interfering with the board's negotiations, but they did not commit an independent breach by using their voting power to veto a sale of assets that "would constitute a radical transformation of CERBCO." *Id.* at 444. The controllers were entitled to use their voting power to maintain the status quo and protect themselves from that result.

Taken together, the decisions from *Heil* to *Thorpe II* outline fiduciary principles for a controller's right to vote that largely parallel a controller's decision to sell. A controller can refuse to vote in favor of, or affirmatively vote against, a transaction that would alter the status quo, even if a board of directors might conclude that the transaction was in the best interests of all stockholders. But when exercising voting power affirmatively to change the status quo, a controlling stockholder owes a fiduciary duty of loyalty which requires that the controller not intentionally harm the corporation or its minority stockholders, plus a fiduciary duty of care that requires that the controller not harm the corporation or its minority stockholders through grossly negligent action.

The two decisions most comparable to this case point in the same direction. The first decision is *Frantz*. As discussed previously, the Delaware Supreme Court upheld a majority controller's adoption of a bylaw that increased the quorum requirement for board meetings and required a unanimous vote for director action. The controller implemented the bylaw amendment to prevent the incumbent board from diluting the controller's stake, which the incumbent directors believed was in the best interests of the corporation. In a clipped and enigmatic ruling, the justices described the bylaw amendment as "a permissible part of [the stockholder's] attempt to avoid its disenfranchisement as a majority shareholder" and concluded that the amendment was "not inequitable under the circumstances." 501 A.2d at 407, 409. The decision suggests that the justices thought it was legitimate for the controlling stockholder to protect its majority stake against dilution and maintain the status quo.

That is the same position that the Delaware Supreme Court later took in *Thorpe II*, where the justices held that the majority controllers could have permissibly vetoed a proposed sale of assets that would have dramatically altered the status quo.

In *Hollinger*, by contrast, the Court of Chancery invalidated a similar unanimity bylaw as a breach of fiduciary duty. 844 A.2d at 1030. The controlling stockholder had committed in writing to support a sale process overseen by the controlled company's board. The controller subsequently sought to implement a different transaction that was in his own best interest. To prevent the board from blocking his efforts, he adopted a *Frantz*-style bylaw that increased the quorum requirement and required unanimity for board action. The court found that the amendments sought to "disable[] the [company] board from protecting the company from his wrongful acts." *Id.* at 1029–30. The court concluded that the amendments "were clearly adopted for an inequitable purpose and have an inequitable effect" because they interfered with the board's ability to maximize value under the strategic process that Black had agreed to support. *Id.* at 1080. Put differently, the bylaw amendments injured the company by interfering with the board's rights under the sale process agreement. *Id.* at 1082. The sale process agreement had defined the status quo, and the controller breached its duties by intentionally using its stockholder power to change it, knowingly harming the company in the process. In an abbreviated decision, the Delaware Supreme Court affirmed. *Hollinger*, 872 A.2d 559.

Read together, *Frantz* and *Hollinger* suggest that a majority controller can use its voting power permissibly to defend itself and preserve the status quo. But if the majority stockholder seeks to change the status quo, then the majority controller cannot harm the corporation knowingly or through grossly negligent action. That outcome is consistent with *Thorpe II* and the other cases addressing controller voting.

### 3. Whether To Apply A Standard Of Review

The authorities that address a controller selling or voting its control block point to a standard of conduct, but they conspicuously do not introduce a standard of review. The decisions do not suggest, for example, that the business judgment rule applies and must be rebutted before a sale-to-a-looter claim can proceed, at which point the controller can avoid liability by demonstrating that the sale was entirely fair. The decisions seem to contemplate that the court will enforce the standard of conduct directly.

When reviewing the behavior of other fiduciaries, Delaware law distinguishes between the standard of conduct and the standard of review. Although Delaware decisions traditionally did not acknowledge the distinction,[28] Delaware jurists now do

---

[28] *See* David Kershaw, *The Foundations of Anglo-American Corporate Fiduciary Law* 185, 221–22 (2018). Despite the lack of open acknowledgement, the divergence could be seen in earlier cases, including decisions distinguishing between the articulated duty of directors to exercise reasonable care and the liability standard of gross negligence. *See, e.g.*, *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000); *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749–50 (Del. Ch. 2005), *aff'd* 906 A.2d 27 (Del. 2006). Professor Kershaw notes that New York cases maintained a similar distinction from the late nineteenth century until the codification of the fiduciary standard of care in 1961. *See* Kershaw, *supra*, at 185–86.

so openly to explain the divergence between the normative framing of what fiduciary duties require and their practical application to the facts of a case.[29]

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis*, 28 A.3d at 457. For transactions involving a controlling stockholder, Delaware has traditionally applied either the business judgment rule or the entire fairness test.

The business judgment rule presumes that when making a business decision, a fiduciary "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[30] Unless a plaintiff rebuts one of the elements of the rule, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598

---

[29] *See, e.g.*, *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 1815759, at *7 (Del. Ch. June 3, 2022) (Glasscock, V.C.); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *15 (Del. Ch. May 31, 2022) (McCormick, C.); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 809 (Del. Ch. 2022) (Will, V.C.); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *30 (Del. Ch. May 6, 2021) (Zurn, V.C.); *Cumming v. Edens*, 2018 WL 992877, at *18 (Del. Ch. Feb. 20, 2018) (Slights, V.C.); *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *27 n.202 (Del. Ch. July 24, 2014) (Noble, V.C.); *Chen v. Howard-Anderson*, 87 A.3d 648, 666–67 (Del. Ch. 2014) (Laster, V.C.); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1112 n.63 (2008) (Parsons, V.C.); *see also Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1275 n.102 (Del. 2018) (Strine, C.J.).

[30] *Aronson*, 473 A.2d at 812 (framing rule as applied to directors).

(Del. Ch. 2010). Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[31]

Since 1994, Delaware law has deemed the business judgment rule rebutted and applied the entire fairness test *ab initio* to any transaction between the corporation and a controlling stockholder in which the controller receives a non-ratable benefit.[32] When entire fairness governs, the defendants must establish "to the

---

[31] *See Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

[32] *See Lynch*, 638 A.2d at 1115; *accord Kahn v. Tremont Corp. (Tremont I)*, 694 A.2d 422, 428 (Del. 1997). *See generally In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *11–16 (Del. Ch. Jan. 25, 2016) (collecting authorities). In 2014, the Delaware Supreme Court held that a corporation could lower the standard of review from entire fairness to an irrebuttable version of the business judgment rule by agreeing up-front to condition a transaction on the approval of a duly empowered, independent special committee and the uncoerced, informed approval of holders of a majority of the disinterested shares. *Kahn v. M & F Worldwide Corp. (MFW)*, 88 A.3d 635, 644 (Del. 2014), *overruled in part by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018). The *MFW* decision addressed a squeeze-out merger and did not speak to other controller transactions where entire fairness review applied from the outset under *Lynch*, *Tremont*, and their progeny. The Court of Chancery has held that the same combination of devices can be used to lower the standard of review from entire fairness to an irrebuttable version of the business judgment rule in those other transactions as well. *E.g.*, *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *11 (Del. Ch. Dec. 11, 2017). Whether a corporation can lower the standard of review for a non-squeeze-out transaction by doing less, or whether entire fairness applies to those transactions from the outset at all, are issues currently before the Delaware Supreme Court. *See In re Match Gp., Inc. Deriv. Litig.*, C.A. No. 368, 2022, at 2 (Del. May 30, 2023) (ORDER) (determining

*court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary IV)*, 663 A.2d 1156, 1163 (Del. 1995) (citation omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

In between lies enhanced scrutiny, which is "Delaware's intermediate standard of review." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013). Enhanced scrutiny synthesizes the lessons from a series of 1980s decisions, when standards of review seemed to proliferate.[33] Each decision was marked by two features. First, there was a specific, recurring, and identifiable context where the realities of the situation could subtly undermine the decisions of even independent and disinterested directors. Second, the action the directors took intruded into a space where stockholders possess rights of their own.[34] The directors' exercise of corporate power

---

to hear issue "in the interests of justice to provide certainty to boards and their advisors who look to Delaware law to manage their business affairs.").

[33] *In re Columbia Pipeline Grp., Merger Litig.*, 299 A.3d 393, 456–60 (Del. Ch. 2023) (describing proliferation and subsequent unification); *Pell v. Kill*, 135 A.3d 764, 784–85 (Del. Ch. 2016) (explaining how "[p]articularly during the 1980s, standards of review seemed to proliferate," but that Delaware courts have subsequently consolidated the various intermediate standards within the framework of enhanced scrutiny); *Reis*, 28 A.3d at 457–58 (discussing variants of enhanced scrutiny).

[34] *E.g.*, *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954–56 (Del. 1985) (creating intermediate standard of review to address resistance to a tender offer where the situational conflict resulted from the "omnipresent specter" that the directors could have been acting to further their own interests or those of incumbent management, "rather than those of the corporation and its shareholders" and the

65

therefore raised questions about the allocation of authority within the entity and, from a theoretical perspective, implicated the principal-agent problem.[35] These situations "do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference [under the business judgment rule]."[36]

---

encroachment on stockholder rights involved the stockholders' ability to tender their shares); *see also Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) (applying intermediate scrutiny where situational conflict resulted from the final-period problem in an M&A setting and the encroachment on stockholder rights implicated the stockholders' right to vote on (and potentially reject) the board's preferred transaction, free of unreasonable interference from their fiduciaries); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 787–88 (Del. 1981) (introducing intermediate standard for review of a decision by a special litigation committee where the situational conflict involved the difficult dynamic of directors deciding whether to cause the corporation to sue their fellow directors and the encroachment on stockholder rights involved a stockholder plaintiff's ability to pursue a derivative claim when demand was excused); *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 658–59 (Del. Ch. 1988) (introducing intermediate standard of review where directors took action in response to an election contest that implicated corporate control and the encroachment on stockholder rights involved the stockholders' right to vote).

[35] To be clear, directors and officers are not agents of the stockholders, nor are the stockholders their principals. "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa*. It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 678 A.2d 533, 540 (Del. 1996) (footnote omitted); *see also Presidio,* 251 A.3d at 286 ("Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders."). The principal-agent problem uses the language of economic theory, not the language of legal relationships.

[36] *In re Rural Metro Corp. S'holder Litig.*, 88 A.3d 54, 82 (Del. Ch. 2014), *aff'd sub nom. RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

Each time a decision addressed one of these situations, the court applied an intermediate standard of review that examined "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end." *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016). Under this standard, the directors must establish that they (i) sought to pursue a legitimate end and (ii) selected an appropriate means of achieving it. It is not enough to have a good faith belief that a particular outcome is desirable; the directors must have a reasonable basis for their belief. It is also not permissible for the directors to pursue the desired outcome by any means necessary. They must select a means that falls within a range of reasonableness.

Among its virtues, enhanced scrutiny enables a court to "smoke out mere pretextual justifications for improperly motivated decisions." *Dollar Thrifty*, 14 A.3d at 598. It thus allows a reviewing court to address inequitable action even when the fiduciaries "may have subjectively believed that they were acting properly." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830–31 (Del. Ch. 2011). The reasonableness standard, however, does not permit a reviewing court to freely substitute its own judgment for the fiduciary's assessment. A court only asks whether a fiduciary has made a reasonable decision, not a perfect decision. If the fiduciary "selected one of several reasonable alternatives, a court should not second-guess that choice even thought it might have decided otherwise." *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994).

Research has not revealed any decisions applying enhanced scrutiny to a controller's unilateral action to amend bylaws or remove directors, but using enhanced scrutiny makes sense in that context. The ability of a controller to exercise its stockholder power in that setting presents the obverse of director action in the same context. Enhanced scrutiny applies when directors amend bylaws or otherwise intervene in elections or voting contests touching on corporate control. Enhanced scrutiny also should apply when a controller does something comparable. If enhanced scrutiny applies to one set of fiduciaries (directors) when they take action that affects the rights of a stockholder majority, it also should apply to a different fiduciary (a controller) who takes action to impair the rights of the directors or a stockholder minority. Here again, enhanced scrutiny mediates between the extremes of the business judgment rule and entire fairness.

Applying enhanced scrutiny in this setting does not seem like a big leap. At least for purposes of bylaw amendments, Delaware law already holds that "bylaws must be reasonable in their application." *Frantz*, 501 A.2d at 407; *see State v. Jessup & Moore Paper Co.,* 77 A. 16, 19–20 (Del. 1910) (treating as settled that bylaws must not be unreasonable). There is also authority indicating that corporate bylaws cannot be adopted for an inequitable purpose.[37] Where bylaws are concerned, applying enhanced scrutiny simply formalizes what courts already do.

---

[37] *See ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558–60 (Del. 2014) ("Bylaws that may otherwise be facially valid will not be enforced if adopted or

This decision therefore applies enhanced scrutiny to evaluate the Controller Intervention. Lampert must show that he acted in good faith for a legitimate objective and had a reasonable basis for believing that action was necessary. Lampert also must show that he selected a reasonable means for achieving his legitimate objective.

### 4. The Good Faith Identification Of A Legitimate Objective

The first step under an enhanced scrutiny analysis is to determine whether the fiduciary acted in good faith, after a reasonable investigation, to achieve a legitimate objective. Lampert demonstrated that he acted properly to prevent the destruction of value that he believed the Hometown liquidation would cause.

Promoting the long-term value of the corporation within the limits of the law for the ultimate benefit of its residual claimants is a legitimate objective. *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *18–19 (Del. Ch. Apr. 14, 2017) (collecting authorities and explaining orientation of fiduciary duties). Indeed, when a corporation has adopted the statutorily permissible purpose of engaging "in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware," 8 *Del. C.* § 102(a)(3), then that objective crystallizes the proper orientation of a fiduciary's duties. Protecting the corporation from harm is one dimension of that proper objective. *See Unocal*, 493 A.2d at 956 ("In adopting the selective exchange offer, the board stated that its objective was either to defeat the inadequate Mesa offer or, should the offer still succeed, provide the 49%

---

used for an *inequitable purpose* . . . . The intent to deter litigation, however, is not invariably an *improper purpose*." (emphasis added)).

of its stockholders, who would otherwise be forced to accept 'junk bonds', with $72 worth of senior debt. We find that both purposes are valid.").

A fiduciary must prove that the objective it relied on at trial was the objective that the fiduciary actually sought to pursue. Fiduciaries "cannot justify their conduct based on threats that they never identified or beliefs they did not hold." *Williams Companies S'holder Litig.*, 2021 WL 754593, at *23 (Del. Ch. Feb. 26, 2021), *aff'd*, 264 A.3d 641 (Del. 2021) (ORDER). Lampert testified credibly that he engaged in the Controller Intervention because he believed that the Board would implement the Hometown liquidation unilaterally. He testified credibly that he thought the Hometown liquidation would destroy value and harm the Company and minority stockholders. His contemporaneous communications reflect similar concerns. Those were his actual purposes, and they were proper ones.

A fiduciary must also have had a reasonable basis for its belief. Lampert had invested in retail for decades. He had lived through bankruptcies involving Kmart and Toys 'R' Us, and he had spent the past months dealing with the Holdings bankruptcy. He was generally familiar with the risks that retail liquidations pose, particularly when conducted outside of bankruptcy. He testified credibly that based on his experience, he believed that the Special Committee and its advisors were drawing unrealistic analogies to the Company's experience liquidating tranches of twenty to thirty stores where the Dealer Agreements were expiring or being terminated voluntarily and where the Company would continue as a going concern. Lampert believed that the Committee and its advisors were dramatically

70

overestimating the proceeds that a liquidation could generate while dramatically underestimating the liabilities that a complete liquidation would precipitate. He had expected to see a detailed analysis in the Company's data room that would support an optimistic valuation of the liquidation option. When there was nothing there, he became all the more convinced that the Company was overlooking a serious risk.

Lampert also has a good faith basis to be skeptical about the Special Committee's assertions regarding the value of Outlet as a standalone business. Outlet had enjoyed one recent year of profitable operations, and it was not clear whether it could establish a successful multi-year trend. Outlet lacked scale, meaning it might be too small to retain talent and support the cost of remaining a publicly traded company. And Outlet would be responsible for any liabilities resulting from the Hometown liquidation.

Lampert did not have a detailed slide deck or report documenting his beliefs. Nor did he need one. If those documents existed, then they would have corroborated Lampert's testimony. Their absence is a factor to consider, but ultimately, Lampert's testimony is enough. He was a credible witness.

Lampert also believed in good faith that the Committee and its advisors planned to implement the Hometown liquidation unilaterally. Lampert initially believed that the Committee and its advisors were bluffing. But after he met with the Board and the Committee, and after he received the $9.50 Ask, Lampert concluded that the Committee was serious. He also knew that the Company had obtained a legal

opinion saying that it could proceed with the Hometown liquidation without a stockholder vote.

The plaintiffs respond that Lampert acted selfishly because the Related-Party Agreements provided him—through Transform—with a non-ratable source of value. A lot of money changed hands under the Related-Party Agreements, but they were not a material source of value for Transform. The Related-Party Agreements were generally favorable to the Company, enabling it to purchase inventory at cost and access services on terms that the Company could not obtain from third parties. The Related-Party Agreements did not give Lampert a way to suck value out of the Company.

The plaintiffs also respond that keeping Hometown afloat was important to Lampert because its small-store model could serve as the basis for a strategy that he wanted to use to revitalize Sears. At times, Lampert considered a small-store strategy, but the evidence at trial did not show that Lampert intended to use the Hometown stores as a cornerstone of that strategy or that it would have resulted in Hometown being particularly valuable to Lampert.

The plaintiffs' efforts to impeach Lampert's credibility failed. Lampert had a good faith basis for acting, formed after reasonable investigation.

### 5. The Adoption Of A Reasonable Means

The second step in an enhanced scrutiny analysis is to determine whether the fiduciary chose a reasonable means for achieving his proper objective. A court must evaluate a fiduciary's actions holistically. *See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1387 (Del. 1995) (directing a court to evaluate the "overall response").

Under that standard, the Controller Intervention fell within a range of reasonableness.

The Controller Intervention was drastic but necessary. Lampert only engaged in the Controller Intervention after concluding that he had no viable alternative. He initially tried to negotiate with the Special Committee through counsel. When that failed, he spoke with management directly. When that failed, he met in person with the Board and the Committee, and he invited the Committee to make a constructive proposal. It was only after the Committee made the $9.50 Ask and reiterated the April 15 deadline that Lampert felt he had no choice but to act.

Given that the Committee was prepared to implement the Hometown liquidation unilaterally, Lampert had to take action that was sufficiently powerful to neutralize the threat. The Controller Intervention was a reasonable means to achieve that end.

The Controller Intervention consisted of both the Bylaw Amendment and the Director Removal. The Bylaw Amendment required that a Hometown liquidation receive approval from 90% of the Board, at two separate Board votes, taken at least thirty business days apart. If the liquidation received the necessary vote at the first meeting, then the Board had to disclose the vote to the stockholders. The Bylaw Amendment technically did not prevent the Board from pursuing the Hometown liquidation, but it created a window during which Lampert could take additional action before the second meeting to stop the Hometown liquidation from happening.

The Bylaw Amendment was less drastic than the *Frantz* and *Hollinger* bylaws. Those bylaws prevented boards from taking any action without the controller's consent. The Bylaw Amendment restricted Board action regarding the Hometown liquidation and imposed procedural limitations.

As a practical matter, the Bylaw Amendment took the Hometown liquidation off the table by enabling Lampert to make sure that he had an opportunity to block it. At trial, Lampert responsibly acknowledged that he had no intention of letting the Special Committee's version of the Hometown liquidation take place. *See* Lampert Tr. 136–40. The Committee or the Board would have needed to convince Lampert to support the Hometown liquidation (not likely) or develop a modified liquidation plan that could gain Lampert's support. The Bylaw Amendment did not prevent the Committee or the Board from acting, but it prevented them from unilaterally implementing the liquidation that Lampert believed in good faith would be value destructive.

The Controller Intervention did not stop with the Bylaw Amendment; it also included the Director Removal. Lampert removed Phelan and Robbins from the Board, which had the effect of also removing them from the Special Committee.

Here too, Lampert took action that was less drastic than he might have taken. He did not remove the whole Board; he only removed two directors. To be sure, the directors he replaced were two of the three members of the Special Committee. Lampert candidly explained his reasoning: Phelan and Robbins had been the most vocal when he met with the Special Committee, he thought they were driving the

74

$9.50 Ask, and he thought they were obstacles to reaching a deal. Lampert Tr. 122–23. By removing those individuals, Lampert sought to break the logjam.

Lampert also did not fill the vacancies with himself or an individual he controlled. He could have done either, thereby inserting himself directly into the boardroom. Instead, he appointed two individuals that he did not directly control. Too much should not be made of that show of restraint, because Lampert appointed individuals suggested by a friend whose fund had provided the bulk of the financing for Transform to buy Holdings' assets. Lampert could be confident that the appointees would support his interests, even without direct ties between them. Still, it was a more restrained step than appointing people he controlled.

Taken as a whole, the Controller Intervention fell within a range of reasonableness. Perhaps Lampert could have achieved the same result by removing only one director rather than two. Or perhaps he might have only implemented the Bylaw Amendment. It is also possible that if Lampert had only implemented the Bylaw Amendment or only removed one director, then the battlelines would have been drawn, positions would have hardened, and the situation would have gotten worse. Lampert make a reasonable choice among debatable tactical alternatives.

### 6. The Finding Regarding The Controller Intervention

Lampert did not breach his fiduciary duties when he engaged in the Controller Intervention. He acted in good faith to protect the Company from a threat of value-destruction. Lampert identified that threat in good faith, after a reasonable investigation. He then responded with a means that fell within the range of reasonableness.

75

The Controller Intervention did not constitute a breach of Lampert's duties of loyalty or care. If nothing else had happened, and if the Company had merely continued operating as it had before the Controller Intervention, then judgment would be entered for the defendants.

## B.     Whether The Transaction Was Entirely Fair

After the Controller Intervention, the Company did not simply continue operating as it had before. The status quo was not sustainable, and the Transaction resulted. Because the Transaction involved Lampert acquiring the Company and eliminating the minority stockholders from the enterprise, the presumptive standard of review is "entire fairness, with the defendants having the burden of persuasion." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012). The Transaction did not deploy the dual, upfront protections of a duly empowered committee and majority-of-the-minority vote, which would cause an irrebuttable version of the business judgement rule to apply. *MFW*, 88 A.3d at 645. The Transaction was negotiated by the Special Committee, but the court did not make a pretrial determination that the Special Committee performed in a manner to shift the burden and require the plaintiffs to prove unfairness. *See Ams. Mining*, 51 A.3d at 1240. The burdens of proof and persuasion therefore "remain[ed] with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction." *Id.* at 1243.

"The concept of fairness has two basic aspects: fair dealing and fair price." *Weinberger*, 457 A.2d at 711. Although the two aspects may be examined separately, they are not distinct elements of a two-part test. "[T]he test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be

examined as a whole since the question is one of entire fairness." *Id.* at 711. Nevertheless, the two dimensions of the entire fairness test interact: "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price." *Reis*, 28 A.3d at 467 (collecting authorities). Although the transaction must be *entirely* fair, "perfection is not possible, or expected." *Weinberger*, 457 A.2d at 709 n.7.

This decision's entire fairness analysis follows a unique path because the Transaction is really two deals in one. In substance, the Transaction combined a third-party sale of Outlet with an interested merger involving Hometown. For fair price, this decision examines the Outlet and Hometown components separately. Because the Special Committee negotiated the Transaction all at once, this decision analyzes fair process by looking at the Transaction as a whole.

Lampert failed to prove that he paid a price that fell within the range of fairness. Lampert also failed to prove fair dealing. Although the Special Committee attempted to negotiate at arm's length, the fallout from the Controller Intervention was too great.

### 1. Fair Price

To evaluate the fair price dimension of the unitary entire fairness test, the court examines the economic and financial merits of the transaction, taking into account all relevant factors. *Technicolor Plenary IV*, 663 A.2d at 1162–63. "Fair price can be the predominant consideration in the unitary entire fairness inquiry." *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *34 (Del. Ch. Aug. 27, 2015).

77

"The fair price analysis is part of the entire fairness standard of review; it is not itself a remedial calculation." *Reis*, 28 A.3d at 465. The court's task is not to pick a single number, as it would for a damages calculation, but to determine whether the transaction was one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."[38]

"The range of fairness concept has most salience when the controller has established a process that simulates arm's-length bargaining, supported by appropriate procedural protections." *Reis*, 28 A.3d at 467. "The range of fairness permits a court to give some degree of deference to fiduciaries who have acted properly; it is not a rigid rule that permits controllers to impose barely fair transactions." *Id.* at 466.

The true test of financial fairness is whether "the minority stockholder shall receive the substantial equivalent in value of what he had before."[39] Before the Transaction, the minority stockholders held a proportionate interest in a company that owned two businesses: a bad business (Hometown), and a good business (Outlet).

---

[38] *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary III)*, 663 A.2d 1134, 1143 (Del. Ch. 1994) (Allen, C.), *aff'd*, 663 A.2d 1156; *accord Kahn v. Tremont Corp. (Tremont II)*, 1996 WL 145452, at *1 ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept.").

[39] *Sterling*, 93 A.2d at 114; *accord Unocal*, 493 A.2d at 956–57 (quoting *Sterling* and describing the substantial equivalence test); *Rosenblatt v. Getty Oil. Co.*, 493 A.3d 929, 940 (Del. 1985) (quoting *Sterling* and applying the substantial equivalence test); *Trados*, 73 A.3d at 76 (same); *Reis*, 28 A.3d at 462 (same).

The Special Committee and Lampert recognized the Company's operative reality. When negotiating the Transaction, they dealt with the businesses differently, and they negotiated the Outlet go-shop to bridge their otherwise unresolvable disagreement over the value of that segment.

The parties' experts have also recognized the Company's operative reality. Both experts submitted DCF analyses that valued the Company as a whole, but assumed a Hometown liquidation and incorporated those cash flows into the projection period. Their DCF valuations thus valued Hometown in liquidation and the rest of the Company as a going concern. Both experts also submitted sum-of-the-parts valuations that combined a liquidation valuation of Hometown with a valuation for Outlet. The plaintiffs' expert used a DCF valuation for Outlet. The defendants' expert used the third-party sale value for Outlet.

This decision evaluates the fair price dimension by viewing Outlet and Hometown separately. For Outlet, the structure of the go-shop provided powerful evidence of fair value. When there is a market-tested price, attempting to value Outlet using a DCF methodology makes no sense.

For Hometown, the task is more difficult, but the expert opinions largely reduce the dispute to a single variable: the proceeds that a liquidation of the Hometown inventory could generate. There is abundant record evidence that the court can use to make a factual finding regarding that issue.

### a. The Expert Valuations

Neither of the parties' experts offered a convincing expert valuation that the court could adopt wholesale. Both experts attempted to value the Company as a

whole. The plaintiffs' opening expert report derived a value of $9.38 per share. JX 874 at 9. The defendants' opening expert report derived a value of $2.77 per share. JX 873 at 83. That amounts to a difference of 238%.

The plaintiffs' expert prepared a DCF valuation for the Company as a whole that used the management projections from the proxy statement for the Transaction. JX 874 at 67. His analysis resulted in an equity value of $141 million, a per share value of $6.01, and a range of $5.66 to $6.34 per share. *Id.* at 110.

That DCF valuation was not sufficiently reliable. The valuation used management's projections for the business, which included overly optimistic projections for the Hometown liquidation. There were two double counting errors in management's projections that resulted in a $19.45 million overstatement of cash flows in 2019. JX 876 at 32. The valuation also used management's overly optimistic projections for the rest of the Company. *See id.* at 14–29. The plaintiffs' expert then made changes that increased the valuation output. One was to lower the cost of debt on the theory that after using the liquidation proceeds to pay down debt, the Company could borrow at a lower rate. *Id.* at 40–43; JX 874 at 95–97. Whether the Company could obtain a lower rate was speculative, because after the Hometown liquidation, it would be a smaller firm with a comparatively new business model. Another was to model the Company's capital structure by using the anticipated debt-level after a Hometown liquidation, while continuing to use other inputs derived from pre-Transaction trading prices. The mixing and matching created internal inconsistencies. JX 874 at 87–93; JX 876 at 36–40. He also derived beta using a set

80

of guideline companies that were not sufficiently comparable to the Company. JX 874 at 86–89; JX 876 at 35.

The plaintiffs' expert's sum-of-the-parts analysis was not persuasive either. *See* JX 874 at 68. To value Hometown, he started with a liquidation analysis prepared by management and used by Solomon. That analysis resulted in a 76.6% realization rate. *Id* at 74–77. He also considered a modified analysis from AlixPartners that generated a 78.3% realization rate with a downside case of 72.6%. *Id.* at 115. He adopted a net realization rate of 76.6%. *Id.* at 119. To value Outlet, he prepared a DCF valuation using projections that appeared in the Confidential Information Statement for the go-shop. *Id.* at 116–17. Those projections were used to sell Outlet and were even more optimistic than the management projections from the proxy statement. *See* JX 876 at 29–31. The sum-of-the-parts valuation generated a fair value estimate of $7.77 per share, with a range of $6.79 to $8.16 per share. JX 874 at 119. The plaintiffs' expert then added $1.61 per share for the NOLs, resulting in a fair value estimate of $9.38 and a valuation range of $8.40 to $9.77. *Id.* at 120.

The defendants' expert started with a valuation of the Company's equity that Solomon presented to the Board on April 6, 2019. JX 873 at 8. The defendants' expert opined that Solomon's comparable companies analysis was not reliable because the companies were insufficiently comparable. *Id.* at 31–33. The plaintiffs' expert agreed. JX 874 at 68. The defendants' expert then performed a DCF valuation by making adjustments to Solomon's model that depressed its valuation output. Those changes included extensive modifications to the projections that boiled down to substantial

disagreements with management. JX 873 at 9–10, 36–57. The defendants' expert went to great lengths to justify the changes, but the revisions nevertheless seemed excessive. *See* JX 877 at 43–69. The defendants' expert also modified the calculation of terminal value and used a higher discount rate. *Compare* JX 873 at 9–10, 68–80 *with* JX 877 at 69–80. The defendants' expert derived a value of $2.24 per share using that methodology. JX 873 at 10, 103. That valuation was not persuasive.

The defendants' expert also prepared a sum-of-the-parts valuation that valued Outlet using its sale price and Hometown using its liquidation value. *Id.* at 10, 90. That is the same basic approach that this decision adopts. The defendants' expert, however, relied for liquidation value on another expert's report that the court excluded. *Id.* at 62, 91. The valuation is therefore not persuasive.

Although neither expert offered a wholly persuasive valuation, the experts did provide helpful clarifications on many issues. The court has weighed the experts' credibility and relied on aspects of their opinions.

### b. A Fair Price For Outlet

Rather than attempting to construct a valuation for the Outlet segment, this decision uses the market-tested price generated by the go-shop process. The plaintiffs have tried to challenge that price, but their criticisms lack force.

As part of the Transaction, the parties agreed to a well-crafted go-shop process that permitted any third party to purchase Outlet at a price that exceeded $97.5 million. The Special Committee and Lampert negotiated the price floor, with the Committee initially proposing $92.3 million and Lampert proposing $103 million. The plaintiffs criticize the floor, and too high a floor might have created an impediment

to bidding. Here, a third-party bidder cleared the floor and ultimately prevailed. The floor was not an impediment.

The Special Committee and Lampert also negotiated a ceiling on Transform's match right. The plaintiffs contend that the ceiling inhibited bidding and prevented the go-shop from maximizing value. To the contrary, that limitation made the go-shop work.

A matching right is the functional equivalent of a right of first refusal, and scholars have shown that rights of first refusal transfer value from the seller and other bidders to the holder of the right.[40] Some Delaware decisions have declared that unlimited match rights do not affect bidding, asserting based on anecdotal evidence that a determined bidder can overcome a match right.[41] In rare settings, exceptional bidders can overcome a match right. But on the whole, scholars have shown that

---

[40] Brian JM Quinn, *Bulletproof: Mandatory Rules for Deal Protection*, 32 J. Corp. L. 865, 870–71 (2007) (analyzing match right as a right of first refusal and noting that "[t]he presence of rights of first refusal can be a strong deterrent against subsequent bids."); Marcel Kahan, Shmuel Leshem & Rangarajan K. Sundaram, *First-Purchase Rights: Rights of First Refusal and Rights of First Offer*, 14 Am. L. & Econ. Rev. 331, 331 (2012) (finding "that a right of first refusal transfers value from other buyers to the right-holder, but may also force the seller to make suboptimal offers."); David I. Walker, *Rethinking Rights of First Refusal*, 5 Stan. J.L. Bus. & Fin. 1, 20–21 (1999) (discussing how a right of first refusal affects bidders).

[41] *See In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1019 (Del. Ch. 2005); *In re Pennaco Energy, Inc.*, 787 A.2d 691, 707 (Del. Ch. 2001).

unlimited match rights create a deterrent for competing bidders that is magnified by

the winner's curse.[42] Practitioners have acknowledged those real-world effects.[43]

---

[42] Guhan Subramanian & Annie Zhao, *Go-Shops Revisited*, 133 Harv. L. Rev. 1215, 1218 (2020) (discussing effect of match rights and winner's curse on go-shop results); Fernán Restrepo & Guhan Subramanian, *The New Look of Deal Protection*, 69 Stan. L. Rev. 1013, 1059–60 (2017) ("When a first-bidder match right is coupled with second-bidder risk aversion, even the possibility that the first bidder's willingness to pay might be large would be a significant deterrent."); Brian JM Quinn, *Re-Evaluating the Emerging Standard of Review for Matching Rights in Control Transactions*, 36 Del. J. Corp. L. 1011, 1027–28 (2011) ("[T]he presence of a matching right in the hands of an initial common value bidder will deter other common value bidders from making bids . . . . [T]he direct effect of the matching rights in the context of a common value auction is to appropriate transaction gains from the seller to the right-holder. Because other market participants are hesitant to offer topping bids in the common value context, this permits the right-holder to offer low-ball bids and thereby extract transaction surplus at the expense of selling shareholders." (footnotes omitted)); Quinn, *Bulletproof, supra*, at 870. (noting that in the presence of a match right, "[s]uccess under these circumstances may involve paying too much and suffering the 'winner's curse.'"); *see also* Steven J. Brams & Joshua R. Mitts, *Mechanism Design in M&A Auctions*, 38 Del. J. Corp. L. 873, 879 (2014) ("The potential for a bidding war remains unless interlopers are restricted—say, to one topping bid, which then can be matched."); Albert H. Choi, *Deal Protection Devices*, 88 U. Chi. L. Rev. 757, 794 (2021) ("[W]hether a match right in fact creates an uneven playing field and whether either party will actually have an advantage depends significantly on whether the match right is limited or unlimited.").

[43] *E.g.*, Frank Aquila & Melissa Sawyer, *Diary Of A Wary Market: 2010 In Review And What To Expect In 2011*, 14 M & A Law. Nov.-Dec. 2010, at 1 ("Match rights can result in the first bidder 'nickel bidding' to match an interloper's offer, with repetitive rounds of incremental increases in the offer price. . . . [T]argets are starting to question whether it makes sense for initial bidders to have match rights when the merger agreement contains an explicit go-shop. Few go-shops are successful as it is . . . and match rights are just one more factor that may dissuade a potential competing bidder from stepping in the middle of an already-announced transaction."); Franklin A. Gevurtz, *Saying Yes: Reviewing Board Decisions to Sell or Merge the Corporation*, 44 Fla. St. L. Rev. 437, 474, 474 n.189 (2017) (Arguing that matching rights may "creat[e] some disincentive for topping bids," because "prospective competing bidders might ask what is the point of investing time into preparing a competing bid if the first merger partner will just match the new slightly better offer," but the same rights are "less likely to deter a prospective competing bidder planning a significant jump.").

The problem is one of game theory. Sophisticated parties look forward and reason back. They consider not only the value of the target relative to the deal price, but also whether they have a path to success. Without the second half of the equation, an overbidder might force the incumbent buyer to pay more, but cannot prevail. Participating in a sale process is not free, so without a realistic path to success, it is irrational to try. *See* Subramanian & Zhao, *supra*, at 1234.

An unlimited match right has its biggest impact on a potential bidder's decision to become involved. If the incumbent buyer can match until the bidding goes beyond its reserve price, then a competing bidder is likely to overpay unless it has a unique source of value. Competing bidders that doubt whether they can outbid the incumbent buyer will not see a path to success. By deterring competing bidders from getting involved, the unlimited match right lets the incumbent buyer capture all of the surplus that the seller and winning bidder would split under competitive conditions.

After a bidder decides to engage, the unlimited match right has less effect. A target likely would go back to the incumbent buyer in any event. The unlimited match right still offers the incumbent buyer some benefit by preventing a topping bidder from demanding deal protections of its own, such as exclusivity, that could end the sale process. In some settings, preventing that type of shutdown bid might help maximize value. In others, it might inhibit the competing bidder from making a market clearing bid conditioned on finality.

Limiting a match right gives competing bidders a more credible path to success. All else equal, that should lead more bidders to compete, and competition

during the post-signing phase (or the threat of it) is what generates incremental value for targets. *See Merion Cap. L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016) (collecting authorities). The cap on Lampert's match right promoted the integrity of the go-shop process, rather than impairing it. So did Lampert's commitment to support a winning bid above the floor price. *See* O'Halloran Tr. 432–33.

The plaintiffs respond that the match right ceiling impaired the go-shop process because bidders did not have any incentive to bid above it. That is wrong for two reasons. First, Lampert did not have a match right above the ceiling, but he could continue to bid. Lampert could thus continue to compete; he simply did not have a contractual guarantee that the Company had to come back to him before entering into an agreement with the competing bidder. Once the bidding exceeded the ceiling, an overbidder could demand an exclusive deal or otherwise make a bid designed to shut down the process. Second, although Lampert stopped bidding at the match right ceiling (and at trial seemed to believe he was obligated to do so), that did not mean that competition would not exist above the threshold. If Outlet had attracted multiple bidders, then competition could have continued and driven the price to a point just above the second-highest bidder's reserve price.

The match right worked as planned. Solomon reached out to 135 potential purchasers and entered into confidentiality agreements with seventeen. Those bidders received copies of the Confidential Information Memorandum. If credited, the

86

financial projections in the Confidential Information Memorandum supported values for Outlet well above the floor price and the match right ceiling.

The Franchise Group engaged and competed with Lampert, ultimately agreeing to a nominal purchase price of $121 million, a working capital adjustment that reduced the nominal purchase price by $1 million, plus two forms of expense reimbursement for the Company that added another $11.3 million. One reimbursed the Company for $5.7 million in transaction expenses; the other reimbursed the Company for $5.7 million in employee severance costs. The total consideration that the Franchise Group paid for Outlet was $131.3 million. JX 873 at 85. That was $33.8 million more than the floor price, reflecting a premium of 28% over the portion of the deal consideration that the floor price implied for Outlet. The net consideration available for potential distribution to stockholders was $119.96 million, and the minority stockholders received their pro rata share of the extent to which that figure exceeded the floor price of $97.5 million.

The plaintiffs complain about the expense reimbursements and portray them as interested transactions, but those expenses reflected payments that were necessary to obtain the value achieved in the sale. Lampert did not agree to swallow 100% of the expenses necessary to achieve a higher bid. By deducting them from the total consideration, Lampert and the minority stockholders bore their proportionate share.

A fair price for Outlet therefore falls in a range around $119.96 million. That price is not a magical answer that values Outlet precisely, but it is the best evidence

available. It reflects a price generated by real-world market forces, and it is more credible than any of the experts' valuations.

### c.  A Fair Price For Hometown

Determining a fair price for the Company's Hometown segment is more difficult for the obvious reason that there is no market price. At a high level, determining the value that Hometown could generate in liquidation requires at least three steps. The first is to estimate the percentage of book value that the inventory could generate in a liquidation sale, resulting in "gross liquidation value." The second is to subtract an estimate of the costs directly related to conducting the liquidation ("liquidation costs"), resulting in "net liquidation value." The third is to subtract an estimate of third-party liabilities that the liquidation would generate, such as breach of contract claims under third-party leases or the Dealer Agreements ("third-party liabilities"), resulting in "risk-adjusted liquidation value."

The Company's lenders hired Tiger to prepare liquidation valuations of Hometown's inventory in the ordinary course of business. Those lenders provided financing to the Company under an asset-backed credit agreement, and the amount of credit that the Company could obtain was calculated using a borrowing base that incorporated a percentage of collateral value.

Tiger's valuation dated December 13, 2018, was close in time to the transaction date. *See* JX 168. Tiger was one of only four firms in the country that specializes in retail inventory liquidation valuations. Tiger was an independent firm, hired by the Company's lenders to value the Hometown inventory for purposes of establishing a borrowing base. Tiger developed its own valuation, rather than relying on

management. In addition, Tiger's liquidation estimate also had to support an equity bid, meaning that if the banks foreclosed, Tiger had to agree to buy the inventory from the banks for the valuation it provided. Those facts make the Tiger realization rate credible, but conservative. *See* JX 877 at 16; Powell Dep. 130–31.

The Tiger appraisal from December 2018 establishes a lower bound for proceeds that a liquidation sale could generate. Using a starting value of $191.1 for Hometown's inventory, Tiger forecast net liquidation proceeds of $122.5 million, for a net realization percentage of 64.1%. Management elsewhere estimated third-party liabilities at $14.3 million. Using that estimate, the risk-adjusted liquidation proceeds drop to $108.2 million.

As discussed when addressing the Controller Intervention, Lampert made a convincing case that the third-party liabilities associated with a Hometown liquidation would likely be several times what management and the Committee anticipated. Lampert did not take the next step and attempt to value those liabilities. To be conservative, this decision doubles management's estimate for a figure of $28.6 million. Using that estimate, the risk-adjusted liquidation proceeds drop to $93.9 million.

Other estimates of risk-adjusted proceeds were more bullish. Using a starting value of $176.4 million for Hometown's inventory, management estimated a net realization rate of 76.6% and a net liquidation value of $135.1 million. JX 318 at 15. That results in risk adjusted liquidation proceeds of $106.5 million. Using a starting value of $185.1 for Hometown's inventory, AlixPartners estimated a net realization

rate of 72.6% and a net liquidation value of $134.3 million. JX 355. That results in risk adjusted liquidation proceeds of $105.8 million.

During Lampert's discussions with prospective lenders to obtain financing for the Transaction, he suggested figures that come out close to the AlixPartners estimate. Lampert proposed valuing Hometown's inventory at 80% of cost and asked for 90% of that amount. JX 757 at 23. That meant Lampert was asking the lenders to let him borrow up to 72% of book value, implying that in liquidation, the inventory could realize at least that amount. Using a starting value of $176.4 million for Hometown's inventory, Lampert's proposal to the banks implied a net liquidation value of $127 million. With an additional $28.6 million in third-party expenses, the risk-adjusted proceeds decline to $98.41 million.

By contrast, the Company's interactions with its lenders suggest a realization rate closer to the Tiger appraisal. After the Controller Intervention, the Company negotiated amendments to its loan agreements. The amendments included a demand by the lenders that the Company could not sell its inventory for less than 70% of cost. That suggests the lenders and the Company believed inventory could be sold in liquidation at that price or higher. A 70% net realization rate implies net liquidation proceeds of $123.5 million. With an additional $28.6 million in third-party expenses, the risk-adjusted liquidation proceeds decline to $94.9 million.

This evidence establishes a range of values for the Hometown inventory proceeds. The most persuasive figure is Lampert's own realization rate of 72%, resulting in risk-adjusted proceeds from the Hometown liquidation of $98.41 million.

90

That figure comports with AlixPartners' estimate and falls in between management's bullish estimate and Tiger's conservative estimate.

### d. The NOLs

Finally, the Company had an entity-level asset in the form of NOLs. They only could be used to offset taxable income over time and thus only would have value to an operating business that otherwise generated taxable income. There were also change-of-control restrictions that limited the ability of a new owner to use NOLs. That meant the value of the NOLs was highly dependent on what happened with the Company.

If Outlet could continue as a profitable business, then it could use the NOLs. If the Company sold Outlet and liquidated Hometown, then the value of the NOLs could be lost. If Lampert bought out the minority and continued to operate the Company, then he could use the NOLs. Even if Outlet were sold, Lampert's ability to extend the glidepath for Hometown meant he could use at least some NOLs.

The experts used different methods for determining the present value of the NOLs, but they generally agreed on a present value of around $30.5 million. JX 876 at 43–48. The NOLs realizable during the period from 2020 through 2022 were approximately $10.9 million. *Id.* at 45.

Valuing the NOLs at $10.9 million is a fair outcome. The plaintiffs' expert agreed that a party was unlikely to get full value for NOLs in a negotiated sale. The shorter time period reflects a compromise among the various possibilities regarding their use.

91

### e. A Sum-Of-The-Parts Valuation

Adding up the valuation components and subtracting net debt provides a fair price for the Company as a whole. The final consideration for Outlet was $119.96 million. Using Lampert's realization rate of 72%, the risk-adjusted proceeds from the Hometown liquidation are $98.41 million. The NOLs realizable during the period from 2020 through 2022 add approximately $10.9 million. That amounts to a debt-free value of $229.27 million. Subtracting net debt of $115.9 million leaves an equity value for the Company of $113.37 million. Assuming there were 22,702,000 total shares outstanding, that equates to a value of $4.99 per share.

Starting with Tiger's conservative appraisal does not change the outcome much. The Company's value to decline to $108.88 million, which equates to a value of $4.79 per share. The estimate of third-party liabilities has the biggest effect. Without doubling the third-party liabilities, the value of the Company using Lampert's realization rate increases to $127.67 million for $5.62 per share.

### f. Lampert's Control

The defendants argue that Lampert already controlled the Company and hence was entitled to acquire the minority for a price that reflected that control. They ask the court to determine the amount of a reasonable control premium and discount the whole Company valuation by that amount, resulting in a fair price for the minority. Although they frame their argument in terms of a control premium, they are actually asking for the court to apply a minority discount. Divining a specific control premium or minority discount is not necessary for assessing fairness. The real question is whether the Transaction consideration implies a premium or discount that falls

within a range of fairness. Comparing the pro rata value of $4.99 per share to the Transaction consideration of $3.21 per share indicates that the Transaction did not offer a fair price, even taking to account Lampert's control.

A claim for breach of fiduciary duty that challenges the fairness of a squeeze-out transaction must account for the implications of control. Chancellor Allen addressed that issue in *Mendel v. Carroll*, 651 A.3d 297 (Del. Ch. 1994). The Carroll family, who were the controlling stockholders of Katy Industries, Inc. ("Katy"), proposed to acquire all of Katy's unaffiliated shares for $22 each. The family informed the board that they only were interested in buying and had no interest in selling any of their shares. The board appointed a special committee, which negotiated with the family and eventually agreed to a transaction at $25.75 per share.

After the special committee had reached its deal with the Carroll family, an acquisition vehicle sponsored by Pensler Capital Corporation proposed to purchase all of Katy's outstanding shares for at least $29 per share. The higher price led the special committee to determine that it could no longer endorse the merger with the Carroll family. After changing its investment partner, Pensler reduced its offer to $28, then to $27.80.

With the special committee having withdrawn its recommendation, the Carroll family exercised its right to terminate its merger agreement with Katy. Over the Carroll family's objection, the board authorized the special committee to negotiate with Pensler. To get around the Carroll family's refusal to sell, Pensler proposed that Katy issue it an option to purchase a number of Katy shares at the transaction price

which, if exercised, would be sufficient to dilute the Carroll family's ownership to approximately 40%. Not surprisingly, the Carroll family strongly objected to that course of action, contending that it would constitute a breach of fiduciary duty. The special committee was willing to pursue the idea, as long as Delaware counsel could opine that the option was legal. When the committee's Delaware counsel could not render a definitive opinion, the Pensler deal fell apart, and the committee discontinued the negotiations. The board resolved instead to declare a special dividend of $14 per share.

A stockholder plaintiff sought a mandatory injunction requiring the Katy board to issue the dilutive option to facilitate the Pensler transaction. Citing *Revlon*, the plaintiff argued that the board breached its fiduciary duties by not issuing the dilutive option because the Pensler deal constituted the best transaction reasonably available. Chancellor Allen held that *Revlon* did not apply, but he agreed that the "obligation the board faces is rather similar to the obligation that the board assumes when it bears what have been called '*Revlon* duties.'" *Mendel*, 651 A.3d at 306. This was because,

> *if* the board were to approve a proposed cash-out merger, it would have to bear in mind that the transaction is a final-stage transaction for the public shareholders. Thus, the time frame for analysis, insofar as those shareholders are concerned, is immediate value maximization. The directors are obliged in such a situation to try, within their fiduciary obligation, to maximize the current value of the minority shares.

*Id.* (emphasis in original).

For Chancellor Allen, the critical issues were (i) how far directors could go "within their fiduciary obligation" to maximize the value of the minority shares and

94

(ii) whether their powers included the ability to facilitate a third-party transaction by diluting an existing control block. Chancellor Allen did not rule out the power of a board to dilute a majority holder. As he had in three prior decisions, Chancellor Allen explained that incumbent directors could not dilute an existing block holder for the purpose of maintaining their control, but they could permissibly dilute a dominant block if the directors acted "in good faith and on the reasonable belief that a controlling shareholder is abusing its power and is exploiting or threatening to exploit the vulnerability of minority shareholders."[44] Under this rubric, if the Carroll family's refusal to sell their shares could be considered an abuse of power or exploitation of the minority, then Katy's board could have authorized the dilutive option and a court would have the ability, on an appropriate factual record, to issue mandatory injunctive relief.

Chancellor Allen concluded that the Carroll family's proposal and its refusal to support the Pensler offer did not present the type of "threat of exploitation or even unfairness towards a vulnerable minority that might arguably justify discrimination against a controlling block." *Mendel*, 651 A.2d at 304. He began by explaining why the two offers were not directly comparable, such that the Carroll family's refusal to

---

[44] *Id.* at 304. The earlier cases in which Chancellor Allen had expressed similar views were *Blasius*, 564 A.2d at 662 n.5, *Freedman v. Rest. Assocs. Indus., Inc.*, 1987 WL 14323, at *8 (Del. Ch. Oct. 16, 1987); and *Philips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *8 (Del. Ch. Aug. 27, 1987). Chancellor Allen drew support for the underlying premise that a board could deploy corporate power to address a threat posed by an existing stockholder from *Unocal*, 493 A.2d 946.

support the numerically higher Pensler offer could not by itself give rise to an inference of exploitation or unfairness:

> Plaintiffs see in the Carroll Group's unwillingness to sell at $27.80 or to buy at that price, a denial of plaintiffs' ability to realize such a price, and see this as exploitation or breach of duty. This view implicitly regards the $27.80 per share price and the Carroll Family Merger price of $25.75 as comparable sorts of things. But they are legally and financially quite different. *It is, for example, quite possible that the Carroll $25.75 price may have been fair, even generous, while the $27.80 Pensler price may be inadequate.* If one understands why this is so, one will understand one reason why the injunction now sought cannot be granted.

> The fundamental difference between these two possible transactions arises from the fact that the Carroll Family already in fact had a committed block of controlling stock. Financial markets in widely traded corporate stock accord a premium to a block of stock that can assure corporate control. Analysts differ as to the source of any such premium but not on its existence. Optimists see the control premium as a reflection of the efficiency enhancing changes that the buyer of control is planning on making to the organization. Others tend to see it, at least sometimes, as the price that a prospective wrongdoer is willing to pay in order to put himself in the position to exploit vulnerable others, or simply as a function of a downward sloping demand curve demonstrating investors' heterogeneous beliefs about the subject stock's value. In all events, it is widely understood that buyers of corporate control will be required to pay a premium above the market price for the company's traded securities.

> The law has acknowledged, albeit in a guarded and complex way, the legitimacy of the acceptance by controlling shareholders of a control premium.

> The significant fact is that in the Carroll Family Merger, the buyers were not buying corporate control. With either 48% or 52% of the outstanding stock they already had it. Therefore, in evaluating the fairness of the Carroll proposal, the Special Committee and its financial advisors were in a distinctly different position than would be a seller in a transaction in which corporate control was to pass.

> The Pensler offer, of course, was fundamentally different. It was an offer, in effect, to the controlling shareholder to purchase corporate control, and to all public shareholders, to purchase the remaining part of the company's shares, all at a single price. It distributed the control

96

premium evenly over all shares. Because the Pensler proposed $27.80 price was a price that contemplated not simply the purchase of non-controlling stock, as did the Carroll Family Merger, but complete control over the corporation, it was not fairly comparable to the per-share price proposed by the Carroll Group.

*Id.* at 304–05 (citations and footnotes omitted).

The fact that the offers were fundamentally different, however, did not end the analysis. As Chancellor Allen explained, "[t]o note that these proposals are fundamentally different does not, of course, mean that the board owes fiduciary duties in one instance but not in the other." *Id.* at 305. Instead, the directors were "obligated to take note of the circumstance that the proposal was being advanced by a group of shareholders that constituted approximately 50% of all share ownership," and that in that circumstance, "the board's duty was to respect the rights of the Carroll Family, while assuring that if any transaction of the type proposed was to be accomplished, it would be accomplished only on terms that were fair to the public shareholders and represented the best available terms from their point of view." *Id.* at 305–06. The rights of the Carroll family included the right not to have to sell their shares.[45]

---

[45] *Mendel*, 651 A.2d at 306 ("No part of their fiduciary duty as controlling shareholders requires them to sell their interest."); *accord Bershad*, 535 A.2d at 844–45 (Del. 1987); *MFW*, 67 A.3d at 508; *see Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) (Allen, C.) ("While the law requires that corporate fiduciaries observe high standards of fidelity and, when self-dealing is involved, places upon them the burden of demonstrating the intrinsic fairness of transactions they authorize, the law does not require more than fairness. Specifically, it does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders."); *see also In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271 (Del. Ch. Oct. 21, 1988) ("[A] controlling shareholder who

> The board's fiduciary obligation to the corporation and its shareholders, in this setting, requires it to be a protective guardian of the rightful interest of the public shareholders. But while that obligation may authorize the board to take extraordinary steps to protect the minority from plain overreaching, it does not authorize the board to deploy corporate power *against* the majority stockholders, in the absence of a threatened serious breach of fiduciary duty by the controlling stock.

*Mendel*, 651 A.2d at 306 (emphasis in original). Chancellor Allen found no indication that the Carroll family's proposal of $25.75 per share was an inadequate or unfair price for the non-controlling stock, nor could he infer that the Carroll family had abused its control by proposing the transaction or refusing to sell. That holding comports with this decision's analysis of the law governing the Controller Intervention: A controlling stockholder can refuse to sell its shares, vote against a transaction, or decline to vote at all without engaging in a fiduciary act.

I applied *Mendel*'s teachings in *In re Books-A-Million, Inc. Stockholders Litigation*, 2016 WL 5874974 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017) (ORDER). The Anderson family-controlled Books-A-Million, Inc. Minority stockholders challenged a squeeze-out merger that the Anderson family effectuated at $3.25 per share. The Anderson family had announced it was only a buyer, not a seller, and conditioned the transaction on the twin *MFW* protections. *Id.* at *1. The plaintiffs argued that *MFW* did not apply because the special committee had acted in bad faith by not seeking to sell Books-A-Million to a third party, noting that one year

---

bears fiduciary obligations . . . also has rights that may not be ignored . . . . includ[ing] a right to effectuate a [squeeze-out] so long as the terms are intrinsically fair . . . . to the minority considering all relevant circumstances."), *abrogated on other grounds by Lynch*, 638 A.2d 1110.

98

earlier, a third party had offered to buy all of the company's outstanding shares for $4.15 per share. *Id.* at *3

I rejected that argument as a matter of law and dismissed the complaint, holding that the Anderson Family did not breach its duties by refusing to sell its shares to third party, then subsequently proposing a going-private transaction at a substantial premium to the market price that nevertheless was less than what a third party might pay for the firm as a whole. *Id.* at *16. The plaintiffs argued that the court could not assume that the third-party offer incorporated a control premium, but that argument was contrary to (i) Delaware decisions recognizing that third-party offers typically include a control premium,[46] (ii) Delaware decisions recognizing that minority shares customarily trade at a discount when a dominant or controlling

---

[46] *See, e.g., Paramount Commc'ns Inc.*, 637 A.2d at 43 (Del. 1994) ("The acquisition of majority status and the consequent privilege of exerting the powers of majority ownership come at a price. That price is usually a control premium which recognizes not only the value of a control block of shares, but also compensates the minority stockholders for their resulting loss of voting power."); *Cheff v. Mathes*, 199 A.2d 548, 555 (Del. 1964) ("[I]t is elementary that a holder of a substantial number of shares would expect to receive the control premium as part of his selling price . . . ."); *In re Marriott Hotel Props. II Ltd. P'ship Unitholders Litig.*, 1996 WL 342040, at *5 (Del. Ch. June 12, 1996) ("[T]he right to direct the management of the firm's assets . . . gives rise to the phenomena of control premia.").

stockholder is present,[47] and (iii) scholars who have documented those propositions[48]

---

[47] *See, e.g., ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 912 (Del. Ch. 1999) ("[B]ecause the market ascribed a control premium to the privately-held majority ownership, it similarly ascribed a minority share discount to the publicly-traded shares . . . ."); *Robotti & Co., LLC v. Gulfport Energy Corp.*, 2007 WL 2019796, at *2 (Del. Ch. July 3, 2007) ("References to trading price may not be especially useful . . . in this instance, because the trading . . . was limited and [the company] had a control shareholder."); *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *8 (Del. Ch. Aug. 19, 2005) (Strine, V.C.) (pointing out that in the appraisal context, "the fair value standard itself is, in many respects, a pro-petitioner standard tha t takes into account that many transactions giving rise to appraisal involve mergers effected by controlling stockholders. The elimination of minority discounts, for example, represents a deviation from the fair market value of minority shares as a real world matter in order to give the minority a pro rata share of the entire firm's value—their proportionate share of the company valued as a going concern."); *Klang v. Smith's Food & Drug Ctrs., Inc.*, 1997 WL 257463, at *11 (Del. Ch. May 13, 1997) (recognizing that "factors that tend to minimize or discount [a] premium [include] the fact that the . . . stock price contain[s] a minority trading discount as a result of [a party's] control" of a company); *MacLane Gas Co. Ltd., P'ship v. Enserch Corp.*, 1992 WL 368614, at *9 (Del. Ch. Dec. 11, 1992) (finding that the "the stock market price . . . was not a reliable indication of the value of the [shares of the company at issue because] . . . the trading price contained an implicit minority discount as a result of [the defendant's] control over [the company]."); *see also Goemaat v. Goemaat*, 1993 WL 339306, at *6 (Del. Fam. May 19, 1993) (applying a minority discount to wife's 11% ownership in a private family business in a divorce proceeding because wife's sister controlled and owned 60% of the business).

[48] *Compare* John C. Coates IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. Pa. L. Rev. 1251, 1273–74 (1999) ("Whether measured against very small blocks that trade on the public stock markets daily or against larger but noncontrol share blocks, control shares command premium prices."), *with* James H. Eggart, *Replacing the Sword with A Scalpel: The Case for A Bright-Line Rule Disallowing the Application of Lack of Marketability Discounts in Shareholder Oppression Cases*, 44 Ariz. L. Rev. 213, 220 (2002) ("A minority discount accounts for the fact that a minority interest, because it lacks the power to dictate corporate management and policies, is worth less to third-party purchasers than a controlling interest."). *See also* Matthew D. Cain, Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, *How Corporate Governance is Made: The Case of the Golden Leash*, 164 U. Pa. L. Rev. 649, 657 (2016) ("[P]ublicly traded shares of firms with a controlling shareholder trade at a so-called 'minority discount.' Because minority shares in a controlled corporation lack the ability to influence the

and noted that the premiums and discounts vary across legal systems depending on the extent of the protections that a particular legal system provides to minority stockholders.[49] I explained that while it was not possible to infer the exact amount of the premium or discount because Party Y's offer potentially included synergies, a comparison between the third-party offer and the Anderson family offer implied a control premium (or concomitant discount) of approximately 30%, within a rational range of discounts and premiums.[50] The price difference was therefore not so facially

---

management of the firm, they trade at a discount relative to other shares.") (footnotes omitted); Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Shareholders*, 152 U. Pa. L. Rev. 785, 787 (2003) ("[T]he controlling shareholder secures value from its control position that is not received by the non-controlling shareholders. In turn, the controlling shareholder can extract the same value from control by selling it at a premium to the value of the non-controlling shares.").

[49] See, e.g., Alexander Dyck & Luigi Zingales, *Control Premiums and the Effectiveness of Corporate Governance Systems*, 16 J. Applied Corp. Fin. 51 (2004); Alexander Dyck & Luigi Zingales, *Private Benefits of Control: An International Comparison*, 59 J. Fin. 537 (2004); Rafael La Porta, Florencio Lopez-de-Silanes, Andrei Shleifer, Robert Vishny, *Investor Protection and Corporate Governance*, 58 J. Fin. Econ. 3 (2000); Luigi Zingales, *The Value of the Voting Right: A Study of the Milan Stock Exchange Experience*, 7 Rev. Fin. Stud. 125 (1994); Michael J. Barclay & Clifford G. Holderness, *Private Benefits from Control of Public Corporations*, 25 J. Fin. Econ. 371 (1989). Other factors can affect control premiums, including "an independent and widely circulating press, high rates of tax compliance, and a high degree of product market competition." Dyck & Zingales, *Control Premiums*, supra, at 53.

[50] *See, e.g., Wilmington Sav. Fund Soc'y, FSB v. Foresight Energy LLC*, 2015 WL 7889552, at *9 n.3 (Del. Ch. Dec. 4, 2015) ("[A] number of studies have found that control premia in mergers and acquisitions typically range between 30 and 50%.") (first citing FactSet Mergerstat, *Control Premium Study 1st Quarter 2012*, at 2 (2012); then citing Jens Kengelbach & Alexander Roos, The Boston Consulting Group, *Riding the Next Wave in M & A: Where Are the Opportunities to Create Value?* 10 (2011)); *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 819 (Del. Ch. 2011) (applying a "conservative" control premium of 23.4%, which was the "median premium for merger transactions in 2004 calculated by Mergerstat . . . ."), *aff'd sub*

large as to suggest that the special committee was acting in bad faith by attempting to facilitate a sweetheart deal for the Anderson family. I also noted that appraisal acts as a further check on expropriation by a controlling stockholder, because when valuing a corporation's shares in an appraisal proceeding, a court excludes any minority discount.[51]

---

*nom. Am. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012); *Prescott Gp. Small Cap, L.P. v. Coleman Co., Inc.*, 2004 WL 2059515, at *28, *13 n.77 (Del. Ch. Sept. 8, 2004) (accepting as "consistent with Delaware law" a control premium valuation range of "30 to 40 percent"); *Agranoff v. Miller*, 791 A.2d 880, 900 (Del. Ch. 2001) (applying a 30% discount to a comparable companies analysis to adjust for an implicit minority discount, noting that the discount in the relevant market sector "tended to be lower on average than that for the entire marketplace"); *Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911, at *4 (Del. Ch. June 15, 1995) (citing available premium data ranging from 34%–48%); *see also* Coates, *supra*, at 1274 n.72 (citing data for the period from 1981 through 1994, indicating that "prices paid in acquisitions by negotiated purchase or tender offer of control shares in public companies exceeded the market prices for the targets' outstanding stock by an average of approximately 38%" and that during the same period, "average prices paid in the same types of acquisitions of large (>10%) but noncontrolling blocks of shares in public companies also exceeded market prices for the targets' outstanding stock, but premiums for these noncontrol share blocks averaged only 34.5%"); Gary Fodor & Edward Mazza, *Business Valuation Fundamentals for Planners*, 5 J. Fin. Plan. 170, 177 (1992) (stating that control premiums paid for public companies averaged 30% to 40% from the late 1960s to the late 1980s); *see also* Rebecca Hollander-Bumoff **&** Matthew T. Bodie, *The Market as Negotiation*, 96 Notre Dame L. Rev. 1257, 1312 (2021) (arguing that "the market for corporate control has significantly high negotiation variance when it comes to the actual assessment of the corporation's control premium.")

[51] *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989) ("The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a 'going concern.'"); *see Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 557 (Del. 2000) ("[T]here can be no discounting at the shareholder level."); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 805 (Del. 1992) ("[A] court cannot adjust its valuation to reflect a shareholder's individual interest in the enterprise."). *See generally* Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers & Consolidations*, 38–5th C.P.S. § V(I), at A-65 (BNA) ("Delaware law

For purposes of this case, the defendants argue that the court must assess the fair price dimension in light of the reality of Lamper's control. They argue that means he is entitled to a control premium and that a discount should apply to the minority shares. Both can be estimated by comparing the transaction price of $3.21 per share with the pro rata value indication of $4.99 per share. With the minority owning 10,267,611 shares, they received total consideration of $51.27 million. Subtracting that figure from an equity value of $113.36 million leaves $62.09 million for Lampert. Dividing that figure by the 12,434,389 shares that Lampert owned means he received value of $4.99 per share. Dividing the delta of $1.78 by the deal price of $3.21 per share equates to a control premium for Lampert of 55.6%. Dividing the delta of $1.78 by the pro rata value of $4.99 per share equates to a minority discount of 36%.

The authorities cited above indicate that those figures are quite large for a public company incorporated in Delaware where the minority shares trade on a domestic exchange. The authorities primarily speak in terms of control premiums, and a premium exceeding 50% is exceptional. For Lampert to have extracted a transaction price that implies a control premium and a minority discount that are so substantial indicates that the price was unfair.

### g. Other Factors

The defendants have cited other factors to justify the Transaction. Those can be dealt with briefly. First, they cite the trading price of the Company's common

precludes the application of a minority discount in an appraisal proceeding at the stockholder level.").

103

stock. For reasons that the plaintiffs' expert explained at length, the trading price is not probative. *See* JX 874 at 123–28. Second, the defendants cite the eventual fate of the Company-ex-Outlet after the Transaction, reporting that the Company ended up liquidating in bankruptcy. That is post-valuation date evidence that the court should not consider. It is also not clear the extent to which Lampert's post-Transaction management decisions played a role in the bankruptcy filing.

### h. The Assessment Of Fair Price

As the foregoing analysis shows, the fair price dimension largely turns on two issues: the amount of net proceeds that a liquidation sale of Hometown's inventory could generate and the third-party liabilities that the liquidation would cause. The valuation indication for the Hometown liquidation proceeds indicates that Lampert underpaid, and the implied control premium is quite high. That indicates that Lampert failed to pay a fair price.

### 2. The Dimension Of Fair Dealing

With the dimension of fair price pointing to an unfair deal, the dimension of fair dealing would have to be overwhelmingly persuasive to vindicate the defendants. "The element of 'fair dealing' focuses upon the conduct of the corporate fiduciaries in effectuating the transaction." *Tremont I*, 694 A.2d at 430. If the fiduciaries successfully replicated arm's length bargaining, then that that evidence of fair dealing can validate a questionable price. As noted, the fair dealing dimension can work in the other direction as well, with process undermining price.

A fair dealing analysis looks to "how the purchase was initiated, negotiated, structured and the manner in which director approval was obtained." *Id*. at 431. The

104

evidence on fair dealing is mixed. It falls well short of the showing that would be necessary to overcome the fair price dimension.

### a. Timing And Initiation

Fair dealing encompasses an evaluation of the timing of the transaction and how it was initiated. *Dole*, 2015 WL 5052214, at *26. "The scope of this factor is not limited to the controller's formal act of making the proposal; it encompasses actions taken by the controller in the period leading up to the formal proposal." *Id.* A court can consider who set events in motion and under what circumstances, such as whether the controller appeared to be targeting a low point in a cyclical valuation cycle. A frequent question is whether the controller has acted after the company has made a significant investment or identified a promising new business strategy but before the investment or strategy has started to pay off.

The transaction process in this case had two phases: before the Controller Intervention and after. Nothing about the original initiation or timing of the discussions raises fairness issues. The Company began evaluating its strategic alternatives as Holdings' condition deteriorated. The Company considered its alternatives with greater seriousness after Holdings declared bankruptcy. The only two realistic possibilities were (i) a Hometown liquidation or (ii) a sale of Hometown or the whole Company to Lampert. From the outset, the Special Committee viewed a sale to Lampert as the superior alternative.

The Special Committee, not Lampert, initiated discussions about a transaction. Acting at the Committee's request, management asked Lampert to make an offer for Hometown or for the Company as a whole. Lampert responded with the

105

$2.25 Offer. Lampert did not time those discussions to take advantage of the Special Committee, the Company, or the minority.

After the Controller Intervention, the Special Committee again initiated discussions with Lampert. At that point, however, the timing of the Transaction had become more difficult, because the Company was under pressure to do something to address Hometown's rapidly deteriorating business. The circumstances surrounding the initiation of the second phase of the negotiations therefore provide some evidence of unfairness, but they would not be significant enough on their own to warrant a finding of unfair dealing.

### b. The Negotiations

Fair dealing encompasses questions of how the transaction was negotiated. *Trados*, 73 A.3d at 58. Evidence of arm's length negotiations is a strong indicator of fairness; their absence is an indication of unfairness. *See Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987).

The use of an independent special committee "can serve as powerful evidence of fair dealing" if the special committee is truly independent and functions effectively. *Gesoff*, 902 A.2d at 1145. "The court's investigation of a special committee process for fairness is highly fact intensive." *Id.* Factors that a court can consider include:

- the existence of a clear mandate that includes the power to evaluate the transaction and say "no,"

- the number of members on the committee, because there is strength in numbers,

- their independence and disinterestedness,

- their understanding of their duties,

106

- the involvement of knowledgeable and independent advisors, and

- how the committee performs.

That list is non-exclusive.

The Special Committee received the necessary mandate and hired knowledgeable and independent advisors. Before the Controller Intervention, the Committee had three members, each of whom was experienced, independent, and disinterested. During this period, the Committee negotiated aggressively on behalf of the minority stockholders. The directors rejected Lampert's $2.25 Offer as a non-starter and refused to even counter. After Lampert spoke with the Board and the Committee in person and lobbied for his proposal, the Committee made the $9.50 Ask. By doing so, the Committee demanded a value at the absolute top end of the range of value that Solomon had prepared. The Committee also imposed the April 15 deadline to put pressure on Lampert.

In hindsight, the Special Committee was too aggressive, and its threats to proceed unilaterally too credible. Lampert concluded that if he did not take action, then the Committee would implement a value-destroying transaction. He therefore engaged in the Controller Intervention.

The Controller Intervention changed matters. Lampert removed Phelans and Robbins, leaving Longino as the sole member of the Special Committee. Lampert also took the Hometown liquidation off the table, thereby foreclosing the option that the Committee and management believed was the most value maximizing. At trial, Lampert proved by a preponderance of the evidence that the members of the Committee and management had been too bullish about the value of the Hometown

107

liquidation. Nevertheless, the Controller Intervention boxed in the Committee and eliminated the Company's principal alternative.

The question therefore becomes whether hemming in the Special Committee through the Controller Intervention necessarily resulted in process-based unfairness. In the abstract, that might seem true, but Delaware law permits a controller to limit a special committee's options to a transaction with the controller. The Delaware Supreme Court has held that when a controller proposes a take-private transaction, the controller can take the position that it is only a buyer, not a seller. *See MFW*, 88 A.3d at 651. Although a committee might question the controller's commitment and explore alternatives anyway to test the controller's resolve, the Delaware Supreme Court allows a committee to credit the controller's statement and negotiate exclusively with the controller. *Id.* Delaware decisions also do not require that the committee be given the power that a board of directors would possess to take potentially decisive action against the controller, such as by adopting a rights plan or by issuing stock to dilute the controller's voting power. A committee that is so constrained cannot fully replicate an arm's length negotiation, precisely because it does not have the full powers that a board could wield.[52]

---

[52] Before *MFW*, Delaware decisions were moving in the direction of requiring a committee to have the full power of the board. In *CNX Gas*, I argued that to replicate arm's length bargaining, a committee needed to receive the same authority when dealing with a controller that a board would possess in a third-party acquisition, including the ability to deploy a rights plan against the controller. *See In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 415–16 (Del. Ch. 2010). In *Southern Peru*, then-Vice Chancellor Strine held that by only focusing on the controller's transaction and not considering other options, the committee exhibited a controlled mindset

In one sense, the Controller Intervention did not go meaningfully beyond the extent to which Delaware law already permits a controller to constrain a committee. The Controller Intervention limited the Special Committee to a choice between agreeing to a deal with Lampert or saying no. The *MFW* decision and its progeny permit a controller to do that.

The Controller Intervention, however, went further by engaging in the heavy-handed tactic of removing two of the three committee members. Delaware decisions have long worried about a controller's ability to take retributive action against outside directors if they did not support the controller's chosen transaction and whether it could cause the outside directors to support a deal that was not in the best

_____

inconsistent with arm's length bargaining. *See S. Peru*, 52 A.3d at 798 ("With this blinkered perspective, the first level of rationalization often begins. For Southern Peru [the company], like most companies, it is good to have growth options. Was it rational to think that combining Southern Peru and Minera might be such a growth option, if Southern Peru's stronger balance sheet and operating capabilities could be brought to bear on Minera? Sure. And if no other opportunities are available because we are a controlled company, shouldn't we make the best of this chance? Already, the mindset has taken a dangerous path."). More recently, in *CBS*, this court relied on *Southern Peru* and questioned a committee's independence where the committee did not secure the ability to explore other alternatives. *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779 (Del. Ch. Jan. 27, 2021) ("[The special committee's] ability to negotiate against the controller is at the crux of that inquiry. By assenting to the [controller's] constraints on their mandate without protest, each member of the [special committee] evidenced their inability to push back against the asserted will of the controller. This docility, in turn, forced the [special committee] into 'a world where there was only one strategic option to consider, the one proposed by the controller . . . [thus entering] a dynamic where at best it had two options[:] either figure out a way to do the deal the controller wanted or say no.'") (quoting *S. Peru*, 52 A.3d at 763, 801). But under *MFW*, a controller can cabin a committee's options, and a committee's mandate can be sufficient even if the committee does not receive the full powers a board would have when responding to a third-party deal.

interests of the company or its stockholders.[53] The Delaware Supreme Court has confirmed that a controller's ability to remove a director or block the director's reelection is not sufficient by itself to call into question an outside directors' independence. *See In re Cornerstone Therapeutics Inc. S'holders Litig.*, 115 A.3d 1173, 1183 (Del. 2015).

> Both the controller and the outside director effectively get the benefit of the doubt. The court does not assume that the controller would take punitive action against an outside director that acted contrary to the controller's wishes or interests, and the court similarly does not assume that the outside directors harbor concern about potentially losing their directorships that would be sufficient to influence their decision making.

*EZCorp*, 2016 WL 301245, at *41. At the same time, Delaware decisions recognize that when controllers actually make retributive threats, that fact is evidence of unfair dealing.[54] Here, Lampert did more than just make a retributive threat. He removed the two directors who were his most visible and vigorous opponents.

---

[53] *See, e.g., Tremont I*, 694 A.2d at 428 (describing the inherent coercion present when a controlling stockholder is on the other side of a transaction as involving the "risk . . . that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder."); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 617–19 (Del. Ch. 2005) (summarizing case law); *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 436–39 (Del. Ch. 2002) (same).

[54] *See Lynch*, 638 A.2d at 1120 (citing threat by controller to bypass a committee); *Reis*, 28 A.3d at 465 (citing threats made by controlling stockholder as "evidence of unfairness"); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 n.38 (Del. Ch. Oct. 2, 2009) ("[N]either special committee approval nor a stockholder vote would be effective if the controlling stockholder engaged in threats, coercion, or fraud."); *cf. Pure Res.*, 808 A.2d at 445 (reviewing tender offer by controlling stockholder under lower standard of review as long as "the controlling stockholder has made no retributive threats.").

Thus, while Lampert did not breach his fiduciary duties by engaging in the Controller Intervention, that act cast a shadow over the balance of the negotiations. That is true even though Longino came back strong and proved to be an exceptional committee member.

After the Controller Intervention, Longino sought to negotiate at arm's length. With the benefit of his advisors, Longino considered his options. He decided that best course was a Hometown-only transaction with Lampert and sent Solomon to ask Lampert to make a proposal.

Lampert preferred a whole-company sale, and after conferring with Solomon, he concluded that the major valuation disagreement involved Outlet. Believing that the two sides were unlikely to agree on Outlet's value, Lampert proposed a whole-company sale with a contingent value right for Outlet. Longino countered by asking Lampert to consider a whole-company sale that included a go-shop for Outlet. Longino's counter became the structure for the deal going forward.

Lampert would not budge on the base consideration of $2.25 per share, but he was willing to negotiate over the go-shop. As discussed previously, those negotiations resulted in a structure that generated a market-tested price. That does not necessarily mean that the minority stockholders received a fair allocation of that price, because they only received incremental value over the floor of $97.5 million.

That allocation may have favored Lampert too much. Out of net consideration of $119.96 million from the Outlet sale, the minority received only $10.59 million, or just 9%. Lampert received 91% of the proceeds, despite owning only 55% of the

111

company. When viewed in isolation, that figure is misleading, because the Company had debt that Lampert assumed in the deal, but it shows how the negotiation of the floor price could affect the allocation of value.

In any event, the negotiations over the Hometown segment were desultory and incomplete. Before the Controller Intervention, the Special Committee had asked for Lampert to pay 75.6% of book value for the Hometown inventory. Lampert countered at 62.5%. The difference partly reflected differences over the level of proceeds that sales could generate, but more so disagreements regarding the amount of third-party liabilities. The negotiations never continued beyond that point, because Lampert engaged in the Controller Intervention.

When the parties picked up the discussions again on April 18, 2019, they focused on Outlet, where the delta between the parties was much larger. Lampert never increased the valuation that he placed on the Hometown inventory. There were no meaningful negotiations over the Hometown side of the deal.

The negotiations over Outlet thus reflect arm's length bargaining, but the negotiations over Hometown do not. The Controller Intervention plainly affected the negotiating leverage between the parties. Lampert failed to show that the Special Committee's efforts to bargain effectively offset the blow of the Controller Intervention. The negotiation process was unfair.

### c. Director And Stockholder Approval

Fair dealing encompasses a review of how director and stockholder approval are obtained. *See Weinberger*, 457 A.2d at 711; *Trados*, 73 A.3d at 62, 65. In this case, that factor is neutral.

112

The method of obtaining director approval provides evidence of fairness. The Special Committee negotiated the Transaction and recommended it to the Board. Relying on the Committee's recommendation, the Board approved it.

At the Board level, the plaintiffs originally had concerns about three directors, including the two that Lampert appointed following the Director Removal. The plaintiffs settled with those directors, and during the settlement hearing, they conceded that the three directors did not do anything to undermine the negotiations. Dkt. 269 at 9–12 (representing that there was no direct evidence that any conflicts of interest on the part of those directors played a role in the Board's decision-making or affected the Board's deliberations). The method of obtaining director approval therefore provides evidence of fair dealing.

By contrast, the method of obtaining stockholder approval does not provide evidence of fair dealing, because Lampert approved the transaction as the Company's controlling stockholder. The Merger Agreement was not conditioned on a majority-of-the-minority stockholder vote, which could have provided evidence that the price was fair. *See ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *19–20 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291 (Del. 2018).

The method of obtaining director approval is a positive. The absence of a majority-of-the-minority vote is negative. This factor is neutral.

### d. Transaction Structure

The final aspect of the fair process dimension is transaction structure. This factor is mixed.

113

The Outlet component of the transaction reflects fair dealing. This court has recognized that when a controller commits to support a sale to a third party and then shops the asset, that fact is evidence of the transaction's fairness.[55] The Outlet Sale followed that pattern.

The remainder of the Transaction, by contrast, was functionally a squeeze-out merger without a majority-of-the-minority vote or any other structural protection. Although he negotiated over the Outlet side of the deal, he never compromised on terms for the Company-ex-Outlet. For that aspect of the Transaction, the structure provides evidence unfair dealing.

### e. The Assessment of Fair Dealing

Taken as a whole, the fair dealing dimension points to unfairness. The deciding factor is the Controller Intervention. Although Lampert did not breach his fiduciary duties when taking that step, its ramifications fatally undercut the Special Committee's ability to negotiate for fair terms.

### 3. The Unitary Determination Of Fairness

An entire fairness analysis requires a unitary determination of fairness. "The concept of fairness is of course not a technical concept. No litmus paper can be found

---

[55] *See Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 538 (Del. Ch. 2003) (noting that the controlling stockholders "were enthusiastic supporters of the effort to find a buyer or strategic partner for [the company]," and consequently, the lack of any higher bid provided evidence that the transaction price was a fair price); *Union Illinois 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 350 (Del. Ch. 2004) (finding merger price was a reliable indicator of the company's value where the company's largest stockholder was willing to sell its stake and the sales process was not flawed in any material respect).

or [G]eiger-counter invented that will make determinations of fairness . . . ." *Tremont II*, 1996 WL 145452, at *8. "This judgment concerning 'fairness' will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case." *Technicolor Plenary III*, 663 A.2d at 1140.

In this case, that unitary determination results in a finding of unfairness. The Company had two distinct businesses, and the Transaction had two components. For Outlet, there was both fair dealing and a fair price. The rest of the Transaction fell short. The fair price analysis shows that Lampert paid a price that was below the range of fairness. Lampert also did not show fair dealing. The Transaction as a whole was therefore unfair.

## C.    The Remedy

The entire fairness test measures whether fiduciaries have complied with their duties. *Reis*, 28 A.3d at 465. "A ruling that a transaction is not entirely fair does not automatically result in liability for the defendants." *Dole*, 2015 WL 5052214, at *38. Nor does it lead ineluctably to a particular remedy.

### 1.    Who Is Liable

Lampert is liable for breach of fiduciary duty in his capacity as a controlling stockholder. As a self-dealing fiduciary, Lampert is "subject to damages liability for the gap between a fair price and the deal price without an inquiry into his subjective state of mind." *Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at *22. This decision has not found that Lampert acted in bad faith. Lampert felt compelled to engage in the Controller Intervention to protect himself, and he did not breach his fiduciary

115

duties by doing so. Nevertheless, the fallout from that step undermined the negotiation of the Transaction, rendering it unfair.

The plaintiffs have also sued the entity defendants that Lampert used to effectuate the Transaction. This court has held that entity defendants that a controlling stockholder uses to effectuate a transaction are jointly and severally liable with the controlling stockholder as aiders and abettors. *Dole*, 2015 WL 5052214, at *39; *Emerging Commc'ns,* 2004 WL 1305745, at *38.

## 2. The Remedy

Once a breach of duty has been established, this court's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate . . . ." *Weinberger*, 457 A.2d at 714. At that point, the remedy could be a damages award equal to the fair value of the shares, but "the measure of any recoverable loss . . . under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings." *Technicolor Plenary II*, 634 A.2d at 371. "In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages." *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 537, 440. The award may include "elements of rescissory damages" if the court "considers them susceptible of proof and a remedy appropriate to all the issues of fairness" presented by the case. *Weinberger*, 457 A.2d at 714. An award exceeding the fair value of the plaintiffs' shares may be appropriate "particularly where fraud, misrepresentation, self-

116

dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved." *Id.*

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe II*, 676 A.2d at 445. Damages must be "logically and reasonably related to the harm or injury for which compensation is being awarded." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006). But as long as that connection exists, "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992) (Allen, C.). "[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer." *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993).

In a plenary breach of fiduciary duty action, "the court can, and has in the past, awarded damages designed to eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship." *Gesoff*, 902 A.2d at 1154. "Once disloyalty has been established, the standards evolved in *Oberly v. Kirby* and *Tri-Star* require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct." *Thorpe II*, 676 A.2d at 445 (first citing *Oberly*, 592 A.2d 445, 463 (Del. 1991); then citing *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 334 (Del. 1993)).

117

> The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

*Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). Once a breach of fiduciary duty has been shown, stockholders are not limited to a fair price. They can be awarded "a fairer price." *Dole*, 2015 WL 5052214, at *38; *Reis*, 28 A.3d at 467.

This case calls for a remedy equal to the difference between the transaction price and the "true" value of the firm. A more significant remedy would be disproportionate. Lampert did not set out to extract value from the minority stockholders. In a world where the Special Committee did not push the Hometown liquidation so aggressively, impose the April 15 deadline on Lampert, and make the $9.50 Ask, the parties might have reached agreement on a deal similar in structure to the Transaction that contemplated a go-shop for Outlet. With the major valuation dispute resolved, and with Lampert never having had to resort to the Controller Intervention, the Special Committee and Lampert could have agreed on a fair division of the Hometown proceeds. Instead, Lampert felt compelled to act, and the ripples from the Controller Intervention skewed the subsequent negotiations.

This decision has found that a fair price would have been $4.99 per share. The minority stockholders received $3.21 per share. The difference is $1.78 per share. With the minority owning 10,267,611 shares, the aggregate liability is $18,314,800.24. The class is also entitled to pre- and post-judgment interest at the legal rate, compounded quarterly, from the closing of the Transaction until payment.

118

### III. CONCLUSION

Lampert did not breach his fiduciary duties by engaging with the Controller Intervention. The fallout from that dramatic act nevertheless created a situation in which the subsequently negotiated Transaction was not entirely fair. Lampert and his co-defendant entities are jointly and severally liable to the class in the amount of $1.78 per share, plus pre- and post-judgment interest. The plaintiffs are awarded costs as prevailing parties.

Within thirty days, the parties will submit a joint letter that either attaches an agreed-upon form of final order or identifies any issues that remain to be addressed and proposes a procedure for resolving them. The invitation to identify issues is not intended to provide an opportunity for a full or partial do-over. It is designed to enable the parties to ensure that the court has addressed all of the matters that the parties have fairly put at issue with the goal of bringing the case to a close at the trial court level.